## A. J. McDANIEL and LUCY McDANIEL v. WALKER D. HINES, Director General of Railroads, Appellant.

### Division One, March 14, 1922.

1. **DAMAGES FOR DEATH: Railroads Under Federal Control: Penalty.** The amount recoverable under Section 4217, Revised Statutes 1919, for death caused by negligence is not such a penalty, fine or forfeiture as to prevent the recovery thereof from the Director General of Railroads for a death caused by negligence of employees while he was operating a railroad under the Federal Control Acts (39 Stat. at L. 645, and 40 Stat. at L. 451) and the measure of recovery is that prescribed by said Section 4217.

2. ———: **Child: Contributory Negligence.** A demurrer to the evidence was improperly sustained and a new trial was properly granted by the trial court, in the suit of the parents of a fourteen year old girl, for her death, where the evidence showed that she was killed at a railroad crossing by a double-header freight train running twenty-five or thirty miles an hour and following in close proximity a passenger train which had just passed over the crossing a very short time before, and no whistle was blown or bell

rung by the freight train and the view of the approaching train was obstructed by piles of logs and a small building so that the child could not see it until within three or four feet of the track upon which it was running.

3. ————: Contributory Negligence: Inability of Deceased to Testify. It requires a clear case to convict the dead (who have no notice of or chance to be heard at the trial) of contributory negligence as a matter of law.

Appeal from Newton Circuit Court.—*Hon. Chas. L. Henson*, Judge.

AFFIRMED.

*W. F. Evans* and *Mann & Mann* for appellant.

(1) The petition states no cause of action. (a) Sec. 4217, R. S. 1919, the Missouri death statute, under which this action is brought, is entirely penal and in no degree compensatory. Grier v. Railroad, 228 S. W. 454; Midwest Bank v. Davis, 233 S. W. 412; Lackey v. Rys., 231 S. W. 956; Miller v. Rys., 233 S. W. 1066. (b) No action can be maintained against the Director General of Railroads, or the United States Railroad Administration, under a state penal statute, such as the so called railroad death statute of Missouri, there being no provision for such suits made either by act of Congress, or the orders of the Director General, issued in pursuance of said act. On the contrary the orders of the Director General specifically deny individuals the right to sue the Director General of Railroads for a penalty imposed by state statute. Mo. Pac. Ry. Co. v. Ault, 256 U. S. 554. (2) The court erred in granting plaintiff a new trial. The demurrer to the evidence was properly sustained. (a) The deceased's contributory negligence was the proximate cause of her death and bars the right of the plaintiffs, her parents, to recover. The deceased, a girl of fourteen years and nine months of age, is presumed to have sufficient capacity and understanding to be sensible of the dangers incident to crossing defendant's mainline track where she knew trains were passing at all hours of the day and night, and to have sufficient understand-

ing to avoid such dangers and to discover the approach of the train. Jackson v. Butler, 249 Mo. 370; L. R. A. 1917F, 70, note. (b) The testimony shows deceased possessed the average intelligence of one of her age, and her negligence in approaching the railroad track at right angles in broad day light with no obstructions to her view or hearing, and with the train at a point where by looking she could have seen it before reaching a place of danger upon the track, was the proximate cause of her death and defeats plaintiff's right of recovery. Payne v. Railroad, 136 Mo. 585; McGee v. Railroad, 214 Mo. 530; Graney v. Railroad, 157 Mo. 666; Walker v. Railroad, 193 Mo. 453; Spillane v. Railroad, 135 Mo. 414; Boesel v. Express Co., 260 Mo. 463; Battles v. Ry. Co., 178 Mo. App. 596; Green v. Railroad, 192 Mo. 131; Laun v. Railroad, 216 Mo. 563; Keele v. Railroad, 258 Mo. 62; Schmidt v. Railroad, 191 Mo. 215; Guyer v. Railroad, 174 Mo. 344; Kelsay v. Railroad, 129 Mo. 362; Farris v. Railroad, 167 Mo. App. 392; Vandeventer v. Railroad, 177 S. W. 834; McMiens v. Rys. Co., 274 Mo. 331; Dyrcz v. Railway, 238 Mo. 33.

*Kelsey Norman* and *Horace Ruark* for respondent.

(1) Appellant's contention, under point one, is based wholly upon the proviso to Order No. 50 issued by the Director General of Railroads October 28, 1918. Plaintiff's suit was at that time pending. (a) This order, like a statute, must be given a prospective and not a retrospective operation and will not be held to apply to a cause of action accrued under the Federal statutes and then pending but only to suits thereafter brought. State ex rel. v. Wright, 251 Mo. 344; Lythe v. Arkansas, 9 How. 314; Hutchins v. Low, 15 Wall. 94; Shipley v. Cowen, 23 Wall. 340; Murray v. Gibson, 15 How. 423; Heong v. United States, 112 U. S. 536; McEwen v. Den, 24 How, 243. (b) The order of the Director General No. 50 does not purport to operate upon pending suits but upon suits "hereafter brought in any court." (c)

A proviso is construed strictly and takes no case out of, the enacting clause which does not fall fairly within its terms, where the enacting clause is general and the proviso is afterwards introduced. United States v. Dickson, 15 Pet. 141; State v. Ewing, 140 U. S. 148. (d) Where a proviso is inconsistent with or repugnant to the purview of the act the latter will be held to prevail. Gist v. Rackliffe, 224 Mo. 369; Brown v. Patterson, 224 Mo. 660. (2) All laws should receive a reasonable construction. General terms should be so limited in their application as not to lead to injustice, oppression or an absurd consequence. It will always therefore be presumed that the Legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. United States v. Kirby, 7 Wall. 482; Stubbs v. Mulholland, 168 Mo. 73; State ex rel. v. Pike County, 144 Mo. 280; Verdin v. St. Louis, 131 Mo. 163; Heydenfeldt v. Gold Co., 93 U. S. 634; Lumber Co. v. Mo. Pac. Ry., 216 Mo. 658; State ex rel. v. Farmer, 271 Mo. 306; Johnson v. Ragan, 265 Mo. 420; State ex rel. v. Board of Curators, 268 Mo. 598. (3) "When the objectionable part of a statute is eliminated, if the balance is valid and capable of being carried out, and the court can conclude it would have been enacted if that portion which is illegal had been omitted, the remainder of the statute thus treated is good." Wilcox v. Gas Co., 212 U. S. 53. (4) The conduct of the deceased child is to be measured by that of one of her age, capacity, experience and the attending circumstances. The question is peculiarly one for the determination of a jury and only in exceptional cases for the court as a matter of law. Deschner v. Railroad, 200 Mo. 310; Jackson v. Butler, 249 Mo. 369; Campbell v. Railroad, 175 Mo. 161; Moeller v. United Rys., 242 Mo. 721; Lange v. Mo. Pac. Ry. Co., 208 Mo. 458; Holmes v. Railroad, 190 Mo. 105; Berger v. Railroad, 112 Mo. 238; O'Mellia v. Railroad, 115 Mo. 221; Saller v. Shoe Co., 130 Mo. App. 722; Marshall v. United Rys. Co., 184 S. W. 159; Shortridge v. Scarritt Estate, 145 Mo. App. 295; Obermeyer

v. Chair Co., 120 Mo. App. 59; Dowling v. Allen & Co., 74 Mo. 14, 88 Mo. 298; Payne v. Railroad, 129 Mo. 405; White on Personal Injuries, sec. 314. (5) It is not sufficient to prevent a recovery, that the infant may have known the dangers of a railroad crossing, but the thoughtlessness, the lack of prudence and want of judgment of children of that age and experience must also be taken into consideration in resolving this question of fact. Deschner v. Railroad, 200 Mo. 310; Anderson v. Railroad, 81 Mo. App. 120; Plumley v. Birge, 124 Mass. 57. (6) The court cannot fix any certain age where an infant is to be charged with negligence as one *sui juris.* Moeller v. United Rys. Co., 242 Mo. 729; Marshall v. Railroad, 184 S. W. 159; Dowling v. Allen & Co., 74 Mo. 14, 88 Mo. 298; Obermeyer v. Chair Co., 120 Mo. App. 59; Campbell v. Railroad, 175 Mo. 161. (7) The running of the freight train, without signals so close behind the passenger train that the sound of the one was not distinguishable from the other was a confusing circumstance liable to throw the traveler off his guard and would make the question of contributory negligence, even though the traveler an adult, a question for the jury. Deschner v. Railroad, 200 Mo. 325; Moore v. Transit Co., 95 Mo. App. 729; McGee v. White, 66 Fed. 502; Union Traction Co. v. Hayworth, 115 N. E. 753; Railway v. Cox, 8 Ind. App. 29; Gray v. Penn. Ry. Co., 172 Pa. St. 383; Flannelly v. Railroad, 225 U. S. 601. (8) The deceased had a right to rely, to some extent, upon the statutory signals being given and while this alone will not excuse a failure to look and listen, it is a matter to be taken into consideration along with the other facts, in passing upon her contributory negligence. Jackson v. Railroad, 189 S. W. 381; Yonkers v. Railroad, 182 Mo. App. 568; Elliott v. Railroad, 105 Mo. App. 532; Kenny v. Railroad, 105 Mo. 270; Swigart v. Lusk, 192 S. W. 143; Moore v. Railroad, 171 Mo. App. 430; Woodward v. Railroad, 152 Mo. App. 408; Dunwoody v. Railroad, 136 Mo. App. 515. (9) The leaving of a space

of two inches or more between the outside planking and the south rail of the main line was negligence upon defendant's part. R. S. 1919, sec. 9944; Ry. Co. v. Matthews, 164 S. W. 1092; Pittsburg Ry. v. Reed, 88 N. E. 1080.

SMALL, C.—I. Appeal from the Circuit Court of Newton County. In this case the plaintiffs' daughter, Nellie, was killed on August 24, 1918, by being struck at a railroad crossing about two hundred feet west of Belfast, a railroad flag station in said Newton County by the pilot of an engine of a freight train of the St. Louis & San Francisco Railway Company. The freight train was following close behind a passenger train. Both trains were going west on the main line. There was a switch track close to and south of the main track on the crossing and running some distance east. The child was going north when struck by the freight train. There was a berry shed about sixty feet long, located about one hundred sixty to two hundred feet east of the crossing and four or five feet south of the switch track. There were piles of walnut logs extending from near the berry shed to within about twenty feet of the crossing on the south of and within about four or five feet of the switch track. The switch track commenced to run in towards the main line at the crossing so that the north rail of the switch track was within about eighteen inches of the south rail of the main line on the crossing at the point where the accident happened. The plaintiffs' child had been sent for a can of coal oil and was going home walking north with the can in her hand when she was struck by the freight engine. The railroad was then in control and being operated by the Director General of Railroads.

The court sustained a demurrer to plaintiffs' evidence, but sustained plaintiffs' motion for new trial. Defendant then appealed to this court from such ruling.

The petition, among other things, alleges that defendant kept the crossing where the child was killed in a dangerous condition, in that there was a space of three

McDaniel v. Hines.

inches left between the boards in which the child's foot was caught, and that said freight train was negligently run at forty miles an hour in close proximity, less than two hundred feet, behind the passenger train, in violation of defendant's rules; that defendant's servants failed to ring the bell upon the locomotive eighty yards from the crossing, and kept it ringing until it passed the crossing and failed to sound the steam whistle on said locomotive eighty rods before it reached the crossing and at intervals thereafter until it passed the crossing. That by reason of defendant's negligence, plaintiffs' daughter, infant fourteen years of age, was struck and killed by the locomotive. The prayer was: "That by the aforesaid negligent and careless acts of defendant, the plaintiffs have lost the labor, support, custody and comfort of the said minor daughter and have been damaged in the sum of ten thousand dollars, for which they pray judgment."

The answers was a general denial and contributory negligence on the part of plaintiffs' said child.

Plaintiff Lucy McDaniel testified: The railroad track ran east and west; the public road ran north and south. She and her husband and children lived in a tent on the west side of the public road, a short distance north of the railroad track crossing. Nellie Lee was their oldest child; she was killed at the crossing near Belfast Station, August 24, 1918. There was no depot at Belfast, just a berry shed; Nellie was in the 6th or 7th grade at her last term at school, "but didn't make it complete," and was not promoted; she had lived in the country most of her life; she had been around railroads very little; had lived there in the tent about a month before her death. The railroad track was in a valley; quite a hill on the south which extended east for a ways; the main line comes around a curve; Nellie had been home all day, staying with the little ones, while witness had been to Neosho. Just before she was struck, Nellie had been up to Mr. Meadows to get some oil; she had to cross the railroad going and returning; when Nellie

went to Meadows she waived at a couple of ladies waiting on the railroad platform to take the passenger train for Racine and as she was coming back from Meadows, the passenger train stopped, just long enough to take these ladies on and permit four passengers to get off, two young men and two young ladies; they (the girls) went to school with her daughter most of her life; these four young people dropped behind the passenger train and went down (west) behind it. As the passenger train "came by our tent the four were following just as fast as possible right behind it. I was sitting there holding the baby. The tent was out in the open. I had just got home from town, had a sack of cookies and was giving the children some cookies. As I looked up and saw the passenger train and saw these four young people right behind it, I seen my daughter coming and she was close to the track and I was facing the way she was coming. I didn't dream of any danger because I didn't see any other train or hear any signals at all, and this passenger train had just passed and I raised my eyes up and saw her as I would see you. At the corner post of the right-of-way, the ground dips down and in rainy weather there is always a mud hole in the public road and it rained heavy that day and got us wet. As I looked and saw the young folks passing and saw my daughter coming, she got to this corner post of the right-of-way and she either had to go to the west of the public road or to the east of it to get around this puddle of mud in the main public road. It was customary to go to the east and she didn't get out of the public road, but she circled to the east side to get out of the mud hole and of course she went down in this dip. That was the last I saw of her until after the train struck her. She was going down to circle around this dip and then had to come up to this switch track. That was a grade up to the switch track, that draw was so much lower than the rails; the main public road dipped down quite a bit into the little draw. Just as I saw her going down in the draw I heard my husband holler and I thought he saw her in danger,

but when I was sitting there I didn't realize there was any danger, and I just glanced around in front of the children and he started to holler and I throwed my eyes up and that was the first I saw of the danger. The first thing I saw was right at the crossing, saw my child hanging over the engine, seems like her head and arms were hanging on the cow-catcher like that (illustrating). Well, it seems she was hanging maybe on the wooden beam, of course I don't understand about an engine. This passenger train went west and this train that struck my daughter went west. There wasn't a thing to keep me from seeing that train when I looked up at my child. I ought to have seen it where I was sitting. The roar of the passenger train may have obstructed my hearing it. The noise and roar of the passenger train wasn't out of hearing at all when my child was struck, what noise the freight train made I laid it to the other train. There was no signal at all. I was always careful to watch the children, knowing they didn't know much about a train, and if there had been any signal I would have been more apt to notice it than anyone on earth for I had the children at heart all the time. The freight train run faster than any I ever did see. There were two engines on the train. It was down grade going west. The train didn't seem to make any noise or fuss whatever, just glided by. We found the body between ninety and ninety-five feet on the south side of the track. I seen her fall. I seen her all the time she was on the engine until she fell. When I got there she was lying on her back with her broken arm lying out like that. There was quite a crew of men working there at the crossing on the track all day Friday. It looked as though they had the main line out for a while. The next morning after my daughter was killed, Mrs. Neece, my husband and Mr. Redding and I went down to the crossing and to the mud hole where I last saw her and we couldn't see any train from there at all for those logs and the berry shed—they were high enough to cut off the view. The logs were piled up something like seven feet high. They began real close to the berry shed and were piled in tiers lengthwise with the

track. The closest logs were not over twenty-five feet from the public road. Coming up this slope to the switch track I would have to get past the logs before I could see anything at all. I would then be not more than four feet from the switch track. When we were examining the crossing, the board next to the switch was raised and splintered and Mrs. Neece set her foot in like that and the foot couldn't draw back, she had on shoes with big heels. Nellie was something over four feet tall. She came just about to my shoulder. When she was in her coffin her ankle seemed a little out of shape; it lay crooked for some cause. At the time she was killed she had on coarse shoes. There was a mark on the heel of her shoe after it was taken off that was not there when she started to Mr. Meadows, and also this mark on the instep was not there. She just seemed like she was my whole help, she was a regular mother to the other children and when I would go away I could depend on her to care for the youngest. She would have been fifteen December 13, 1918. She was as bright as the common run of course. I think anyone would know the danger of going there. When within about four feet of the passing track I could see a distance down the track east, but the way it curves there not any length of distance; would be three or four feet south of the passing track before the walnut logs would not obstruct the view; after you passed the logs, the berry shed would obstruct the view; after passing the berry shed the hill would obstruct it. Where Nellie started to cross you had to cross four rails, first, the south rail of the passing track, then the north rail of the passing track, then the south rail of the main track and then the north rail of the main line. Had to cross two rails of the passing track before crossing the main track. This berry shed was a flat building; the west end is boarded up. I saw the trains every day, but never saw them run so close together before. The passenger train had just got by the public road when I saw Nellie down in this low place by the mud hole. These two young men and ladies were right behind the passenger train. You know our tent was a little west of the public

road and when I looked up and saw her they were right opposite, south in my line of vision as I looked up and saw Nellie, and as I looked up, the passenger train was going right past my house, going west and these four young people were right behind in the main track following. When I last saw Nellie the passenger train was not farther west of the crossing than from here to the corner of this room over there, and those young people were between the crossing and the train. These young people did not come back after the accident. I saw them quite a way down the track when I went down to Nellie.''

The plaintiff A. J. McDaniel testified: That August, 1918, he was getting out some walnut logs for the Government, near Belfast, and camped there, his home being about ten miles northwest. He piled the logs directly west of the berry shed right east of the public road and south of the loading track. From the east side of the public road to the berry shed was about two hundred feet. The shed was fifty or sixty feet long. The logs were piled straight parallel with the railroad track. Had about two hundred and twenty-five to two hundred and thirty logs so piled. The closest point they were to the track was four feet and ten inches. The closest they were to the public road was twenty feet. The piles were seven to eight feet wide. Coming north to the track is up grade; a hill south of the railroad runs east and west about same direction as the railroad. At the berry shed the track ran east and west, but about three hundred feet east makes a curve to the south. "I was at home about 7 o'clock that evening. Nellie had stepped up to Mr. Meadows to get some coal oil. I saw her coming back. When I first saw her she was right at the south side of the loading track, about sixteen feet south, coming up grade, to the railroad. A passenger train had just pulled through. It was not out of sight when I first saw her. She was killed on the crossing by a double header freight train. I saw the train, it was running mighty fast. The track is down grade west. The train didn't blow any whistle or ring any bell, I noticed that

in particular. When I first noticed the girl coming she was right west of the berry shed and the log pile—I was on the north side of the track where I could see the train. She was coming along west of the berry shed and log pile and as she stepped on the north side of the logs and berry shed, she had about four feet of plain view of the train and then when she made them two steps up she realized the train was coming and pushed herself back and throwed up her right arm and about that time the train struck her and I ran there to see if I could see some trainmen to stop the train, but I could not see any—the train went right on. Just a second before the train got her, she looked east. She seen the train just a second, about the time she made her last step before she pushed herself back she looked east. She pushed back and if she could have got back a little further the train wouldn't have hit her. She had a can of coal oil in her right hand and the boiler timber struck her arm. She would have had time to have walked across before the train struck her after she looked east—would only have had to take two or three steps either way to be in the clear. Next morning we went down to the crossing and seen that board that had been taken up and put down. There was a crack in it that Mrs. Neece put her shoe in and couldn't get it out as it would catch her heel and her shoe. That was as near as I could tell where I saw the girl. It was on the second rail of the switch track about eighteen inches from the south rail of the main track. A big crew had been working on the track for several days. After the girl was killed I examined the objects that would obstruct your view on the east. I found that at the west end of the logs and berry shed you couldn't see a train until you were within four or five feet of the switch upon a level with the rails, then you could see up the track plainly. Nellie was about five feet tall, came up to my shoulder. The ground was practically level where the logs were piled, until you get back to the road south of the railroad—the wagon wasn't as high as the railroad— the track went over a four or five foot fill there. I was

the first one to Nellie. She was dead—the breath just leaving her body when I approached her. I saw her just before the train struck her. I made an effort to warn her. I screamed and hollered. Lived in the tent from the last day of July; accident happened August 24th; tent was two hundred feet north and west of the railroad crossing. Quite a number of trains passed day and night. The only obstruction after she got to the bottom of the hill was the pile of logs and the berry shed. The train hadn't come in sight when I saw her. I saw the train. She would be about thirty feet from the railroad when she started up this grade—the road rises two feet in ten as you come up. She was sixteen feet from the south side of the side track when I first saw her. I was near the tent. I couldn't see all of her at first, but she came more in view as she walked up the road approach, as she got close to the track I could see her whole body. This switch track is located south of the main line. It starts a little bit west of the public road and branches off and runs parallel with the main line on east of the berry shed half a mile; comes on across the bend. At the crossing there are four rails to cross, you have to cross the two rails of the passing or switch track first coming north. From the center of the public road to the berry shed is one hundred and sixty to two hundred feet. The track begins to curve about three hundred feet east of the berry shed. The train was about sixty or seventy feet west of this point curve when I first noticed it. It was between me and the curve when I first noticed it—about one hundred and fifty feet east of the berry shed. Nellie had about sixteen or seventeen feet to go, while this train ran three hundred. She was sixteen or seventeen feet from the track when I first saw her and first saw the train three hundred feet away. Upon the north side I had a plain view. She was on the east side of the public road about three feet from the east line. Farther up the side track east of the berry shed there was a cook car standing. Nellie did not look east until she passed the pile of logs. She then had about four feet to go until

she touched the south rail of the passing track. There was about four feet and eight inches between the rails of the passing track and about eighteen inches between the north rail of the passing track and the south rail of the main line. She stepped over the south rail of the passing track and then put her left foot right at the north rail of the loading (passing) track. She never took any more steps. Just as she planted her left foot there the train struck her. She was bare headed. The train never slowed up any. About the time she took the last step, she realized the train was coming. She was just in the act of turning when the train struck her. Her left foot was eighteen inches south of the south rail of the main track. Her right foot was between the rails of the switch track. When she placed her foot at the north rail of the switch track the train was six or seven feet away. If when she was two or three feet south of the passing track she had looked east she could have seen the train coming. If her foot had not been caught she would have had time to go north. She paused a second. Didn't see her foot caught. She just paused a second or so before she reversed herself. It all happened in a second of time. She had to go one way or the other right now and she got back as fast as she could. The oil can was in her hand just over the pilot beam." THE COURT: "Did she slacken her speed any or increase it any time from the time you observed her about sixteen feet south of the passing track until she hesitated at the point she was struck?" Answer: "No sir." There were several other witnesses who testified for plaintiffs: One said the train was going twenty-five or thirty miles an hour—one said as fast as passenger train, she should judge,—she watched the train and heard no signals; two men sitting in the engine waived at her little girl as they passed her house, about ninety rods southeast of the crossing. Two others testified they were near and that they heard no bell rung or whistle sound before the train reached the crossing. Mrs. Neece said she put her foot in the crack in the plank at the crossing the next morning and it caught her heel and

McDaniel v. Hines.

she couldn't turn her foot, she didn't try to take her foot out. She corroborated plaintiffs as to the view being obstructed to the east by the logs and berry house and the curve in the track and nook of timber until they got "right on the track," she said. But she believed she could have seen the top of the train over the pile of logs. Redding testified that he could not get his heel in the crack or in between the planks and the crack was in the center of the main track. Another witness testified as to the locality of the tracks and berry house substantially as stated by those preceding.

This was the substance of all the evidence.

II. The appellant contends that plaintiffs' petition states no cause of action because it is for the death of the plaintiffs' child caused by operating a locomotive and cars and that in such cases the damages provided by our statute are a penalty "of not less than two, or not more than ten thousand dollars," as decided by this court in Grier v. Railroad, 228 S. W. 454, and subsequent cases. That if this is so, this suit cannot be maintained against the Government or Director General of Railroads because the Supreme Court of the United States has recently decided in Missouri Pacific Railroad Company v. Ault, 256 U. S. 554, that under the Acts of Congress, taking over the railroads, no action to recover a penalty, fine or forfeiture will lie against the Government.

But we think that case is distinguishable from the Grier Case and the case we have to decide. The suit before us is for damages by the father and mother of a deceased minor child, alleged to have been

**Death Claims: Railroads: Director General.** killed by the negligence of the defendant's servants in operating its locomotive and cars. It was originally instituted against the St. Louis-San Francisco Railroad Co., but by agreement, Walker D. Hines, Director General was substituted as defendant. The alleged cause of action accrued on the 24th day of August, 1918, while the Government was in control of the railroad. Suit was brought September 18,

1918, and has been pending ever since then. While it is true that this court in the Grier Case, supra, held that the amount recoverable in such cases by the plaintiffs under our statute (R. S. 1919, sec. 4217) was purely penal and that the amount thereof "is not to be limited or controlled by the rules of law that govern the assessment of compensatory damages" the court also held, l. c. 458, that while the "object of the statute was primarily to punish" it was "secondarily or incidentally to afford compensation" to persons who had sustained or were presumed to have sustained a pecuniary loss and that "the lawmakers intended that the jury, in fixing the forfeiture, should take into consideration, both the facts constituting the negligence or wrongful act with the attending mitigating and aggravating circumstances, and those showing the extent of the pecuniary loss inflicted." In other words, we held that while the amount or penalty allowed by the statute and to be fixed by the jury was not limited to the pecuniary loss of the plaintiff, such penalty included and was given the plaintiff in the case in lieu and instead of any and all compensation, for pecuniary loss, loss of society and comfort and mental pain and anguish. In said case of Railroad v. Ault, a discharged employee of the Director General brought suit to recover wages for every day after seven days that he was not paid the wages due him when he was discharged, as authorized by a statute of Arkansas. The court held he could not recover the wages not earned, because such wages were allowed as a penalty and not as compensation and that the Federal Act of Control did not authorize and order No. 50 prohibited suits against the Government for fines, penalties and forfeitures. In that case the railroad company itself was a party, but the court held that under the said Federal Act of Control the railroad company was not liable because it was not in control of its property at the time, but that the Government which was in control, was liable and could be sued under said Act of Congress, for the wages due plaintiff and unpaid with interest and cost, but not for the wages which were un-

earned and which were allowed him as a penalty pure and simple. In that case there was a definite sum universally recognized as the proper measure of damages for the delay in the payment of money after it is due, to-wit, interest and costs of suit. Anything over that was a pure gratuitous penalty. The broad general language of the court in that case to the effect that the Government was, under the Federal Act of Control and order No. 50 of the Director General, liable for compensatory damages in the operation of the railroads, but not for a penalty imposed by state statute against carriers, must be read with reference and confined to the case before the court. Here the penalty sought to be recovered is not a purely gratuitous penalty, but is a sum allowed to be recovered in lieu of all other damages and compensation for the death of a child—an injury the monetary compensation for which cannot be measured with any degree of accuracy, and which necessarily must be but a rude and more or less arbitrary approximation. While it is a penalty against the carrier and is to be fixed and determined as such in the manner declared in the Grier Case, supra, it is also the sole measure of the compensation to be allowed the aggrieved parties for the injury sustained. The penalty is so limited in amount by the statute that the law cannot be said to allow unjust damages or penalties to be inflicted. In many, if not in most, cases the statutory allowance would be less than just compensation from the ordinary human point of view. But, such has always been the policy and rule of measuring the award recoverable by plaintiff in such cases in Missouri. Our earlier statutes made it a fixed penalty of $5,000, no less and no more, in all cases of death from negligence in operating cars or other public conveyances. Under our present statute, if in any case the verdict should be excessive, it is subject to diminution as to the excess over $2,000, the same as in other cases of excessive verdicts, by the court.

It seems to us that permitting recovery in such cases against the Government when in control of the carrier,

as provided by our statute as construed in the Grier Case, supra, is in harmony with the intent of the Government manifested by the Act of Control referred to in the Ault Case, and is not in conflict with the construction put upon such Act of Congress by the learned court in its opinion in said case. This view is also confirmed, it seems to us, by the provisions of the Act of Congress of 1920, known as the Transportation Act, 41 U. S. Stat. 456, not passed upon by the learned court in the Ault Case.

By Section 206 of said Transportation Act it is provided as follows: "Sec. 206. (a) Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the Act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this Act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this Act, be brought in any court which but for Federal control would have had jurisdiction of the cause of action had it arisen against such carrier. . . .

"(d) Actions, suits, proceedings, and reparation claims, of the character above described pending at the termination of Federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a).

"(e) Final judgments, decrees, and awards in actions, suits, proceedings, or reparation claims, of the character above described, rendered against the agent designated by the President under subdivision (a), shall

be promptly paid out of the revolving fund created by section 210. . . .

"(g) No execution or process other than on a judgment recovered by the United States against a carrier, shall be levied upon the property of any carrier where the cause of action on account of which the judgment was obtained grew out of the possession, use, control, or operation of any railroad or system of transportation by the President under Federal control."

It would seem that under the express terms of said Transportation Act, above set forth, this suit could have been brought against the agent designated by the President even after the termination of Federal control, if not barred by limitation, because it was a suit "based on a cause of action arising out of the possession, use or operation by the President of" a railroad or transportation system, under the Federal Control Act "*of such character as prior to the Federal control, could have been brought against such carrier.*" But the suit having been brought and being pending against Director General Hines, prior to the relinquishment of Federal control, in the language of said Transportation Act, "shall not abate, but may be prosecuted to final judgment against" the Presidential agent who may be substituted as defendant in place of Director General Hines. In Adams v. Quincy O. & K. R. R. Co., 229 S. W. 791, we held that such substitution could be made in this court on motion while the case is pending here or by amending the mandate should the case be decided before the substitution is made.

In our opinion, the suit is well brought against the Government, the same as it could have been brought against the railroad company, had it, and not the Government, been operating the railroad when plaintiffs' child was killed. Also, if plaintiffs are entitled to recover, they can recover the amount prescribed by our statute as construed in the Grier Case, supra.

III. As to the demurrer to the evidence: We think it was improperly sustained and therefore a new trial

was properly granted to the plaintiffs. Considering the age, intelligence and experience of the plaintiffs' daughter and the difficulties and obstructions to her view to the east, which the evidence tended to show, it cannot be said, as a matter of law, that with her to look was to see and that had she looked she certainly would have seen the freight train in time to avoid it. So there were cir-

**Demurrer to Evidence.** cumstances tending to lull her into security caused by the negligence of the defendant. The law required the bell to be rung or the whistle sounded at certain distances and intervals from the crossing to notify persons approaching the crossing of the approach of the train. No bell and no whistle was no doubt a suggestion to the child that no train was coming from the east, because, she had lived there in the tent for a month within two hundred feet of the crossing and the presumption is that the law was usually complied with theretofore and the whistle sounded or the bell rung upon engines when approaching the crossing and that she knew this fact. But the prime factor in this tragedy according to plaintiffs' evidence was that the freight train was running too fast and too close behind the passenger train. The passenger train passed over the crossing, after having stopped at the little station to take on two and let off four passengers, when the plaintiffs' daughter was at the mud hole in the public road within the line of the right-of-way. She must, therefore, have been within forty or fifty feet of the crossing when the passenger train passed over it. She, no doubt, did look and see this passenger train and saw it pass west over the crossing and leave the crossing clear and safe for her to proceed on her journey. The noise of the passenger train also, doubtless, prevented her from recognizing the approach of the freight train by the noise it made. So that under the circumstances in evidence, both her vision and hearing were interfered with and her mind drawn away from her danger and she was in effect invited to pass over the crossing without further investigation; that the way was clear. The four young people

on the track immediately behind the passenger train, two of whom she knew, likely also attracted her attention away from the direction from which the freight train was coming. The fact that they were upon the track so close to the crossing just behind one train was another signal to her that the way was clear and that there was no danger of another train being upon the crossing before she could walk the short distance required to pass over it. Even the cries of her father, intending to warn her of her danger and the muddy place in the roadway, around which she "circled," may have diverted her attention away from the direction of the approaching freight train at the very moment she otherwise would have turned her eyes to the east and might have seen the train, although her view was much obstructed, in time to avoid it. There are too many distracting and confusing circumstances to justify us in taking the case from the jury because of deceased's contributory negligence in going upon the crossing. It requires a clear case to convict the dead (who have no notice of or chance to be heard at their trial) as a matter of law, of contributory negligence in such cases. Much support will be found for the conclusion we have reached in the following, among other cases cited by respondents' counsel: Deschner v. Railway Co., 200 Mo. 1. c. 325; Kenney v. Railroad, 105 Mo. 270; Baker v. Railroad, 122 Mo. 1. c. 544-545; Jackson v. Railway, 189 S. W. (Mo.) 383; Weller v. Railway, 164 Mo. 1. c. 204-205, 120 Mo. 1. c. 653; Jones v. Railway, 220 S. W. 485; Moore v. Transit Co., 95 Mo. App. 729; Stevens v. Railroad, 67 Mo. App. 356; French v. Railroad, 116 Mass. 537; Flannelly v. Hudson Co., 225 U. S. 601; McGhee v. White, 66 Fed. 502.

The last case cited was decided by the U. S. Court of Appeals, opinion by TAFT, J., and concurred in by Judges LURTON and SEVERANCE. That was the case of an adult, and where the deceased drove his team over a railroad crossing right after one train had passed and was struck by another which he failed to look for or see, which followed within a minute and a half after, or while

he drove his team forty yards. The court said, at page 504: "The work train had passed over the crossing not more than one and a half minutes before Kennedy was struck, and he had good reason to believe, therefore, that another train was not following within so short a time and distance. The shortness of the time between the two trains is shown quite satisfactorily by a calculation based on the time it took to reach the track from Mrs. Caldwell's house, which he left as soon as the work train had passed. If Kennedy's team went at three miles an hour and the train twenty-one miles an hour, and they reached the crossing at the same time, Kennedy went in that distance but forty yards, while the freight train must have gone seven times as fast, or two-hundred-eighty yards. This would indicate a distance of not more than a sixth or a seventh of a mile between the two trains, running at twenty miles an hour. This is a very much less distance than the usual distance between trains running in the same direction, and is most dangerous. Kennedy might therefore reasonably presume that in the forty yards he had to go to reach the track, another train would not pass the crossing. At least this circumstance prevents us from holding as a matter of law that his failure to look was contributory negligence." The opinion then cites and approves the case of French v. Railroad, 116 Mass., supra, which is also approved by Judge BLACK in the Baker Case, 122 Mo., supra. Distinguishing Elliott v. Railway, 150 U. S. 245, Judge TAFT concludes: "The case is a very different one from the one at bar, in that what caused the death there was something which the person killed had reason to expect, whereas here the proximity of the two trains on the same track was not only unusual, but was attended with much danger to the persons on both trains." In the case before us the freight train followed the passenger over the crossing within such a short time that the deceased did not have time to walk much, if any, over forty or fifty feet in the interval. The evidence shows the trains here were even in closer proximity and the freight train going faster

than in the case decided by Judge TAFT. The operation of these trains at the speed shown and so close together was a most unusual, reckless and wholly unexpected occurrence which no person, young or old, could as a matter of law be required to anticipate and guard against. The question of contributory negligence was for the jury. The ruling of the lower court therefore, in sustaining the · motion for new trial, was right and is affirmed. Let the record so show. *Ragland, C.*, concurs; *Brown, C.*, absent.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur; *Graves, J.*, in result.