PRUDY A. PRYOR v. JOHN BARTON PAYNE, Agent of United States Railroad Administration, Appellant.

In Banc, July 3, 1924.

1. **NEGLIGENCE: Penal Statute.** Section 4217, Revised Statutes 1919, is not a penal statute. [Following McDaniel v. Hines, 292 Mo. 401.]

2. ———: **Evidence: Res Gestae.** Declarations need not be coincident with the injury in order to be competent as *res gestae*. After deceased and his companions had crossed a railroad track at a

public crossing, deceased, an old man, said to them, "You men go on; I have had all the walking I care about." They walked on to view some cattle in a near-by pasture, and while there a train passed. They returned in four or five minutes after the injury, and found the old gentleman lying about twenty feet from the track, his knees drawn up, his head twisted to one side, his arm bleeding, and his hat and pipe lying in the middle of the public road, about three feet from the track. They immediately approached him, and he said, "I am done for, for all time to come," and then in answer to inquiries from them concerning the manner of his injuries he told them that while crossing the track his legs gave way; that he couldn't get across, and the train struck him; that he saw the train a half mile away; that he "had worlds of time to have made it," if his legs "hadn't given way." He died two days later. *Held*, that these statements were *res gestae*, or verbal acts, and a part of the occurrence or accident; and since the questions were suggested by his first voluntary statement, his answers thereto were a part and parcel of the same verbal acts, and the court properly permitted the two companions to testify what statements and declarations he made at that time. [Following Leahey v. Railroad, 97 Mo. 165, and State v. Martin, 124 Mo. 514.]

3. ————: Case for Jury: Failure to See Deceased on Track: Proof. The fact that neither the fireman nor engineer saw deceased at all, either approaching or on the track or right of way at a traveled public crossing, or knew of the accident when it happened, when had they looked they would have seen him, lying down or standing up, for more than a half mile before the train reached the crossing, and that they failed to ring the bell or sound the whistle as required by law, is evidence that they were not carefully watching out for persons who might be on the crossing; and further evidence that the train could have been stopped within one thousand feet, and that deceased, whose legs were numb, stated within four or five minutes after the train struck him that his legs gave way and that he had "worlds" of time to have gotten across the track if his legs had not given way, is evidence, in view of a verdict for plaintiff, which must on appeal be given the most favorable interpretation for plaintiff of which it is reasonably susceptible, and is sufficient to carry the case to the jury on the humanitarian rule.

4. ————: ————: Presumption of Due Care: No Crossing Signals: Inference. If the declarations of deceased made within four or five minutes after the injury are not admissible as *res gestae*, and no witness saw the accident or any of the incidents connected with it, the presumption is that he was not guilty of contributory negligence in going upon the railroad track at a public crossing; and

304 Mo.—36.

there being evidence that no crossing signals were given, and the statute requiring them to be given, the presumption is that the failure to give them was the proximate cause of his injury when struck by a train, and the burden is on the railroad company to show to the contrary, and there being no such showing it cannot be held as a matter of law that the failure to give the statutory signals was not the cause of his death, but the case is one for the jury.

Headnote 1:   **Death**, 17 C. J. sec. 222.   Headnote 2:   **Evidence**, 22 C. J. par. 545.   Headnote 3:   **Railroads**, 33 Cyc. 1083, 1129;   **Appeal and Error**, 4 C. J. par. 2834.   Headnote 4:   **Death**, 17 C. J. par. 167.

Appeal from McDonald Circuit Court.—*Hon. Charles L. Henson,* Judge.

AFFIRMED.

*W. F. Evans, O. R. Puckett* and *Mann & Mann* for appellant.

(1)   The petition states no cause of action.   Sec. 4217, R. S. 1919, under which this action is brought, is entirely penal and not compensatory in any amount. Grier v. Railroad, 228 S. W. 454.   No action can be maintained against the Director General of Railroads or the United States Railroad Administration under a state penal statute.   Mo. Pac. Ry. Co. v. Ault, 65 L. Ed. 647. (2)   The court erred in overruling defendant's demurrer offered at the close of plaintiff's evidence and renewed at the close of all the evidence in the case.   (a)   Deceased's statements must be taken as a whole in determining whether they were a part of the *res gestae;* they cannot be separated and a part thereof held to be of the *res gestae* and the remainder not.   What he said following the accident came after time for deliberation, and circumstances surrounding the scene of the accident had changed; his statements were mere historical narratives of a past event and not such spontaneous utterances as to characterize them as verbal acts.   State v. Reeves, 195 S. W. (Mo.) 1027; Redmon v. Railway, 185

Mo. 1, 11; State v. Hendricks, 172 Mo. 654, 672; Barker v. Railway, 126 Mo. 143, 147; Grant v. Railway, 172 Mo. App. 334, 341; Ruschenberg v. Railway, 161 Mo. 70, 79; Dunlap v. Railway, 145 Mo. App. 215, 221; Leahy v. Railway, 97 Mo. 165, 172. (b) Excluding the statements of the deceased as hearsay and not of the *res gestae* there remains no evidence to support the allegations of negligence. A recovery cannot be had by building inference upon inference, but every inference must be a rational deduction from a fact, or facts, in evidence. Cases infra. (c) If the declarations of deceased were properly admitted in evidence, defendant's demurrer should have been sustained because the evidence is wholly insufficient to make a prima-facie case under the pleadings. The testimony does not support the contention that deceased was lying upon the track when struck. His statement was that he was struck by the pilot beam. This was a physical impossibility, unless he was standing when struck. Justice v. Frisco, 224 S. W. 79; Hamilton v. Railway, 250 Mo. 714; Baecker v. Railway, 240 Mo. 507; Rashall v. Railway, 249 Mo. 522; Burge v. Railway, 244 Mo. 94; Carlson v. Railway, 187 S. W. 842; Grear v. Harvey, 177 S. W. 780; McGee v. Railway, 214 Mo. 530.

*Leo H. Johnson, J. A. Sturges* and *John T. Sturgis* for respondent.

(1) The petition states a cause of action. Sec. 4217, R. S. 1919, is the only statute under which this plaintiff, or any other plaintiff similiarly situated, could recover damages from the defendant for injuries sustained by her husband, resulting in his death. While the statute expressly uses the words "shall forfeit and pay as a penalty," still this is not such a penalty as was contemplated by the court in the Federal case cited by appellant. This statute, classified as a purely penal statute by the court in the case of Grier v. Railroad Co., 228 S. W. 454, is, viewed under the Federal law, absolutely compensa-

tory, even though providing for a minimum recovery of two thousand dollars. In reality this provision of the statute could quite properly be termed a liquidated damage statute and operates as a minimum valuation upon human life, fixed by the Legislature, in cases where wrongfully and negligently taken. (2) · The court properly overruled the demurrer filed by defendant. Where reasonable minds might differ on plaintiff's right of recovery, when the evidence is viewed in the most favorable light to plaintiff, a demurrer should never be sustained. Brown v. Quercus Lbr. Co., 209 S. W. 314; Beckerman v. Kort-Kamp Jly. Co., 175 Mo. App. 279; Steffens v. Fisher, 143 S. W. 1101. (a) The court properly admitted statements by the deceased made immediately, i. e.; within four or five minutes, after the accident, to Reber and Alburty, who first approached him, while lying in the ditch, along the right-of-way, in the position and condition where thrown by the train. These statements are of such nature as to preclude the possibility of premeditation and design, or intent to fabricate or formulate statements of fact upon which the deceased might recover damages. Instead they are spontaneous and explanatory of the cause and constitute a part (verbal acts) of the litigated act itself, and explain clearly the true and vitally important causal facts which could in no other way be brought before the court. Leahey v. Cas Ave. & Fair Grounds Ry. Co., 97 Mo. 165; Jewell v. Mfg. Co., 166 Mo. App. 555, 559; Vaughan v. Railroad Co., 177 Mo. App. 155, 174; Enithwhistle v. Feighner, 60 Mo. 214; Harriman v. Stowe, 57 Mo. 93, 95; Brownell v. Pacific Ry. Co., 47 Mo. 239, 244; Stoeckman v. Terre Haute Ry. Co., 15 Mo. App. 514; Giles v. Railroad Co., 169 Mo. App. 24, 34; Greenlee v. Casualty Co., 192 Mo. App. 303, 308; State v. Martin, 124 Mo. 514, 524; State v. Gabriel, 88 Mo. 631, 639; Hooper v. Insurance Co., 166 Mo. App. 209, 212. (b) If the statements of the deceased are excluded as not constituting a part of the res gestae, then this case should be reversed and remand-

ed so as to permit the plaintiff to go to the jury upon the circumstantial evidence. The record shows that the employees of the defendant operating the train in question, approached and passed over the public crossing where the deceased was struck and injured, without giving the statutory or any signals and without keeping a lookout ahead down the track at such crossing. This makes a prima-facie case. The presumption of reasonable care on the part of plaintiff's husband attends him until overcome by positive proof to the contrary, and apparently defendant is unable to overcome this presumption. McGee v. Railroad, 214 Mo. 530, 544; Stotler v. Railroad, 200 Mo. 107, 137, 146; Green v. Railroad, 192 Mo. 131, 143. Excluding deceased's statement as to the circumstances of his injury, and there being no eye witnesses, the presumption obtains that he exercised due care and was not negligent, until and unless this presumption is overcome by evidence to the contrary, and there is here no evidence of contributory negligence. Petty v. Railroad, 88 Mo. 306, 320; Stotler v. Railroad, 200 Mo. 107, 146; Weller v. Railroad, 164 Mo. 180, 198; Crumpley v. Railroad, 111 Mo. 152; Buesching v. Gas Light Co., 73 Mo. 219.

SMALL, C.—Suit for damages for the death of husband. Plaintiff's husband, W. A. Pryor, was struck by a freight train on the St. Louis-San Francisco Railway, while being operated by Walker D. Hines, Director General, on the 23rd day of November, 1919, about two o'clock in the afternoon. He died from his injuries two days afterwards. The accident occurred at the crossing of said railroad with a public highway about a mile east of the town of Ritchie in Newton County.

The petition states, in effect, that when the train was about one hundred and sixty rods distant, and the deceased had just stepped on the railroad track at said crossing, his legs gave way beneath him, becoming numb and useless, leaving him helpless on the railroad track,

in imminent peril from the approaching train; that defendant's servants operated said train in a careless manner, approaching and passing over said crossing at a speed of twenty or twenty-five miles per hour, without maintaining a lookout ahead, and without giving any signals to travelers on or approaching the crossing, as required by law; that said servants saw, or by the exercise of reasonable care could have seen, the deceased on said crossing in such helpless condition in sufficient time by the exercise of ordinary care to have slowed down and stopped the train without striking him; but that said servants in charge of said locomotive and train negligently, with undiminished speed, ran said train against the deceased, so wounding him that he died on the 25th day of November, 1919. Plaintiff prays judgment for the sum of $10,000 damages and costs.

The answer was filed by John Barton Payne, Agent of United States Railway Administration, and contained a general denial and a plea of contributory negligence on the part of the deceased.

The plaintiff's evidence tended to show: The deceased at the time of his death was past seventy-two years of age. On November 23, 1919, he left the home of his step-son, W. H. Alburty, about two o'clock P. M. with Alburty, accompanied by Ed Reber, a neighbor, and Alburty's little son, seven or eight years of age, to see some cattle which Alburty owned and kept in a pasture about a half mile south of his home. Alburty's home was on the public highway, which ran north and south over the crossing in question, and about a quarter of a mile north of this crossing. When they got about 207 feet south of the crossing, the deceased stopped in the road and said, "You men go on, I have had all the walking I care about." Reber and Alburty and his little son then went on south down the road about 336 feet, and then east about 534 feet, to where the cattle were in the pasture, stayed there a couple of minutes, and then returned west. After they had proceeded west seventy-

five or one hundred feet, they saw the freight train coming from the west, and the engine was then about 200 or 250 feet east of the crossing. They continued to walk in an ordinary leisurely way west to the public road, and then turned north and walked to the point where they had left Pryor. They saw nothing of him. They then proceeded north to the railroad crossing. They first observed Pryor's hat and pipe lying in the middle of the public road, about three feet north of the north rail. The hat lay with the crown up, apparently uninjured. They next saw Pryor lying about twenty feet north of the north rail and northeast of the crossing. Pryor was lying partly on his left side and left arm, he was below the level of the track about three or four feet, the track there being evidently on a fill of that height. He was lying generally east and west, and his knees were drawn up toward his body, and his head was lying in a kind of a twist to the right. The railroad embankment had a place scraped off of it about two feet long and wide, about eleven feet from the north rail. The deceased was found in this condition by Alburty and Reber within four or five minutes after they first saw the freight train one hundred fifty or two hundred feet east of the crossing. As soon as they saw him, they immediately approached him, and when they got up to him, he said, "I am done for for all time to come." Alburty then testified, after deceased made this remark, as follows: "I asked him, 'What had happened, that you are here in this kind of shape'? And he said, 'The train struck me; while crossing the track my legs gave way and I couldn't get off in time.' I said, 'Did you see the train?' He said, 'Yes, the train was over half way to Ritchie. I had worlds of time to have made it, if my legs hadn't given way'. "Q. What was said, if anything, next? A. He asked us to lift him up to see if he could stand on his feet, and we did, and he asked us to leave him down. His legs hung in a kind of drawn position towards his body, he did not let them down to

the ground at all. Immediately after we placed him back where he had been lying, he spoke of his pains, and we braced him up, and he spoke of his back hurting him so. While he was in that position, he said his back hurt him, and that his arm was perfectly numb, the left arm. That arm was naked and the clothing had been torn away and it was bleeding some.'' It was about ten minutes after the accident until the deceased was at the home of his step-son, Alburty, where he was taken and put to bed. He was conscious and knew everything at that time, and for about two hours afterwards, when he became uncon-scious. The accident happened on Sunday, and he died the following Tuesday without regaining consciousness. On the day he was hurt, it was bright, clear and warm, and the railroad track was dry. While standing in the center of the track a half mile west of the crossing Alburty was able to discern a man lying flat on the crossing.

On cross-examination, Alburty said that, when he first went up to Pryor, after the accident, deceased said nothing about numbness in his legs, or not being able to move a muscle. And from what the deceased said to him, he did not know whether deceased was on the track or some little distance from the track, when he first saw the train. When back from the track fifty feet, deceased could have seen the train by looking west towards Ritchie, if the train had been half a mile away at that time. If there weren't crops or something there, he could have seen it to Ritchie. There had been a corn crop there. The right of way is probably fifty feet on each side from the track. He could see the train to Ritchie. Don't think he could have seen a train one-half mile west of the crossing until he was inside of the right of way, on account of the corn field. After he got to that point, about fifty feet from the track, there would be nothing to obstruct his view of the train until after he got on the crossing.

On re-direct examination, Alburty, among other things, testified: Deceased, after he had been raised up

and let down where he was injured, next said: "If I had known anything like this would have happened to me, I would not have come." "I told him that I would not have had it happen for anything, and I asked him if his pains seemed to be relieved any, and asked him if he knew what part of the train hit him, and he said, 'It 'was the wooden beam the cow-catcher was bolted to.' He repeated again, that he saw the train and had plenty of time, if his legs hadn't give way under him. I think, at this time, he said they became numb. He told me, after I asked him how far he was from the track when his legs gave way, that he was just in the act of stepping over the south rail of the track. Q. Where was the train at that time, if he said? A. At the time he was crossing the track? Q. Yes, sir. A. He didn't say where the train was."

The testimony of Ed Reber for plaintiff was to the same effect as that of the witness Alburty, Reber testifying, among other things, as follows: "He (the deceased) said he had worlds of time to cross the track when he saw the train coming, and he could not get off in time. He didn't say where he was when his legs gave way. He said, when he went to cross the track, he had worlds of time to get across, but his legs failed him."

Defendant duly objected and excepted to the admission of all declarations of deceased made after his injury, as not part of the *res gestae*.

Dr. Wright testified for plaintiff: He got to the Alburty home, where Pryor was, about 4:30 in the afternoon on the day of his injury. He was in bed and unconscious. Both bones of his left arm were broken. A slight laceration on the top of his head and on the left leg was found. Skin on the back seemed to be puffed up a little, on the same side as the broken arm. Visited him the next morning and examined him again. His back showed a little discoloration and swelling. Couldn't tell whether the spinal cord was injured or not. The place on his back was something like the size of the hand.

Was not present when he died. Think death was possibly from some internal injury or injury to the spine, possibly from the shock. Had treated·him twice in the preceding two years for numbness in the legs.

A. E. Thane testified for plaintiff: He was Deputy County Surveyor, and had surveyed the Frisco Railroad from Ritchie to the crossing in question. The grade does not exceed one-fifth of one per cent. The grade for a half mile west of the crossing is less than one foot in six-hundred. To all intents and purposes, from the crossing to Ritchie, the track runs due east and west, and ·from the crossing to the signal tower at the depot at Ritchie is 5563 feet. ,

Being re-called,. 'Alburty testified: Pryor arrived at his house about eleven o'clock that morning, and that his general condition, as far as he was able to observe it, until after he left him at the point 207 feet south of the track, was good. ·

S. W. Carden testified for plaintiff: The freight train in question was a through train. According to the time-card it stopped at Granby. Granby is eight miles from Neosho, and Ritchie is thirteen miles. The running time of the train was forty-five minutes from Neosho to Ritchie. The engineer's seat in the cab is seven and one-half or eight feet above the ground. The pilot beam is at the top of the pilot and set back about two feet. The pilot on that engine is about four and one-half feet above the ground. The cow-catcher would strike you about the middle of the back.

S. A. Gates, conductor on the train, testified for plaintiff: The train consisted of an engine and thirty-two freight cars, having a tonnage of 1450 tons after leaving Ritchie. On cross-examination he said: He first learned of the injury to Pryor the day after the accident. He remembered that day they were traveling at a high rate of speed and were making up time leaving Ritchie. The train was running thirty-five or forty miles an hour after leaving Ritchie to the public cross-

ing where the accident happened. It would require a thousand feet within which to stop that train, and it would be five hundred feet after the emergency brakes were set before you could notice the speed of the train begin to slacken.

Sidney Adams testified for plaintiff: It was a warm pleasant day and he was sitting on his porch, before the accident, and saw the passenger train pass about two o'clock, and the freight train followed it up. The freight train wasn't over ten minutes behind the passenger. He had lived beside the track there for twenty-seven years, and had noticed the speed of trains a good deal, and generally knew about how fast a train is going. From his general observation, and watching trains passing, and inquiry, in his opinion, that train (the freight-train which injured deceased) was going about twenty-five miles an hour, and the speed didn't change any from the first time he saw it until it got past his view. He noticed it for half a mile before it got to the crossing. The right of way there at the crossing is sixty-six feet wide, and you can stand on either side of the track thirty feet and see clear down to Ritchie. The train gave no signal, and did not whistle, nor ring the bell, for half a mile or more before it reached the crossing.

Arthur Hutchinson testified for plaintiff: He had been a locomotive engineer for thirty-seven years and was familiar with the engine known as class 1300 and type 49 in use on the train which injured the deceased. Said freight train, under the circumstances shown in evidence (which were described in the question asked him), if going at a speed of twenty-five miles per hour on a dry track, within a half mile of the crossing in question, could have been stopped, with safety to the equipment and men on the train, within the space of four telegraph poles, or about 520 feet. And if going at forty miles an hour, it could have been stopped in about the space of six telegraph poles, or approximately 1000 feet. The engineer in his cab on that engine could have

seen a man on that crossing, on a clear day, pretty good, a quarter of a mile away, enough to distinguish that it was a person, without any trouble.

Defendant's evidence was as follows:

R. E. Hoover, the fireman on the freight train that struck Pryor, testified: The first he knew of the accident was four or five days after it happened. He could not recall the incident, and couldn't recall what he was doing at the time. But this being a straight track, he was probably attending to the fire; if not, he was on his seat looking ahead. His seat was at the left window of the cab, and when he was on his seat, he was keeping a lookout ahead at all crossings. He saw no man lying on or near the track at this crossing on that trip, or any object on the track that could be a man.

E. E. Ash, the engineer on the train that caused the injury, testified: He knew nothing of the accident at the time it happened. He didn't see anyone near the crossing. He did not know what he was doing, before he approached the crossing, any more than that he was attending to his duties as engineer.

"Q. What are your duties as an engineer on approaching a crossing of that kind? A. Well, I am always looking ahead to see if there is anything there, and when I ascertain that there is no one at the crossing or around the crossing, I might take my eye away from the place at that time and turn to something about the engine. I have other duties besides keeping a lookout ahead. I have the engine to look out for, and I am supposed to look back at the train sometimes to see if any cars are broken down or any hot boxes. At times, we are stopping between stations to take care of signals. I have to watch the water.

"Q. What do you have to do with reference to watching the water? A. I try gauge cocks and look at the glass. It is very necessary to keep the water at a certain height in the boiler. I saw nothing around the crossing or the track. At that crossing there is a board

fence, like all the rest of the crossings, which crosses the right of way at a forty-five-degree angle and comes up to the track. If a man was lying north of the north rail on the road, or near the road at that point, it would be very difficult to see him when more than a few feet from the crossing. He might be lying close to the north rail of the track and in danger of being struck by some portion of the engine, and at a speed like that, he might not notice a man lying there. The wing-fence could obstruct your view. As we approached this crossing, I would judge we were running forty miles an hour, and it would require about 1200 feet for us to have stopped that train at that time, having regard to the safety of the train and the employees. If the train had been running at twenty-five miles an hour, it could have been stopped in something like 800 feet. It is the duty of the fireman to keep a lookout on the left-hand side of the engine, when he isn't putting in a fire.''

He didn't remember what his fireman was doing. The fireman usually figured to fix the fire on a straight track. That was a straight track between Ritchie and this crossing. Running that train at forty miles an hour, it would be 200 or 300 feet before you could notice the train checking at all, after the use of the emergency. If it was running at twenty-five miles an hour, witness could ''get the train checked within 100 feet. I would notice it beginning to check the speed. I whistled at the whistling post west of the crossing.''

At the close of the testimony, appellant, John Barton Payne, asked a peremptory instruction to the effect that, under the pleadings and evidence in the case, the plaintiff was not entitled to recover against said defendant, which the court refused. Other instructions were given for both parties, but they are not set out in the abstract of the record, nor mentioned in appellant's brief.

The jury found a verdict in favor of plaintiff for $2500. Judgment was entered thereon, a new trial was

requested by appellant, and refused. The case was thereupon appealed to the Springfield Court of Appeals, and by that court certified to this court.

I. The point made by appellant, that the Director General was not liable in this case, because Section 4217, Revised Statutes 1919, under which the suit is brought, was a penal statute, is not well taken. In McDaniel v. Hines, 292 Mo. 401, 239 S. W. 471, we fully considered this contention, and held that it was untenable.

II. It is next urged by appellant that each and every statement or declaration of the deceased, after he was injured, testified to by Alburty and Reber, was erroneously admitted in evidence, because not part of
**Res Gestae.** the *res gestae.* We cannot agree to this contention. It is well settled that the declarations need not be coincident with the injury. In this case, four or five minutes intervened between the declarations and the injury, which, in view of their nature and the circumstances under which they were made, we do not regard as so long a time as to exclude them as part of the *res gestae,* or that they were not spontaneous or verbal acts within the rule in such cases.

In Leahey v. Railway Co., 97 Mo. 165, the result of the authorities was summed up by BLACK, J., as follows, at page 172:

"These authorities show that there is still some diversity of opinion, both as to the rule, and as to the application of a given rule. Care must be taken not to make the field of *res gestae* too large or too contracted. The better reasoning is, that the declaration to be part of the *res gestae,* need not be coincident, in point of time, with the main fact to be proved. It is enough that the two are so clearly connected that the declaration can, in the ordinary course of affairs, be said to be the spontaneous exclamation of the real cause. The declaration is then a verbal act, and may well be said to be a part of the main

fact or transaction. Again, if the subsequent declaration and the main fact at issue, taken together, form a continuous transaction, then the declaration is admissible. Much, therefore, depends upon the nature and character of the transaction in question; for it may be, and often is, of a continuing character. It cannot be said that a mere subsequent declaration will of itself furnish a sufficient connecting circumstance. Applying these declarations to the present case, it is clear that what the boy said as to how he got under the car, *when first picked up,* was properly received as evidence of the cause of his injuries. *He was then at the scene of the accident, surrounded by persons who witnessed the calamity,* and his declarations then made were verbal acts, *though made after the accident had happened.* But what he said after he had been removed to the house of Mr. Keating, after the persons connected with the accident had separated, and in answer to questions as to how he got hurt, should have been excluded. These answers were but narratives of what had transpired, made and intended as such. The time between the accident and making these declarations is short, it is true, but they are disconnected from the main fact." (Italics ours).

In State v. Martin, 124 Mo. l. c. 525, opinion by GANTT, J., the court adopted the rule laid down in Wharton on Evidence, quoting the following extracts therefrom with approval: "'The *res gestae* may be (therefore) defined,' says Dr. Wharton, 'as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist, as we will see, of sayings and doings of any one *absorbed in the event,* whether participant or bystander; they may comprise things left undone as well as things done. . . . In other words, they must stand in immediate causal relation to the act—a relation not broken by the inter-

position of voluntary individual wariness, seeking to manufacture evidence for itself.' [1 Wharton's Law of Evidence, sec. 259.] This statement of the general rule has received the indorsement of this court and of the Supreme Court of New Jersey in Hunter v. State, 40 N. J. L. 495, and of the Supreme Court of Pennsylvania in the recent case of Com. v. Werntz, 29 Atl. 272.''

After reviewing many other authorities, Judge GANTT states the law and the facts in the case before him, as follows: (1. c. 529): ''Here we have a citizen going to his home in the night. He is assailed by a ruffian and stabbed to the heart. Instinctively he cries, 'Police, Police,' and is seen to stagger and cry out, 'I'm fainting,' 'I am gone,' 'Catch me,' and falls to the ground. The witness who testified to these facts runs to his relief, finds him covered with blood. Knowing that a physician resides only *a block and a half down the street,* he runs to his house, rings the bell and at once is answered. The doctor cannot come. He runs back to the injured man. In this short interval, an officer has arrived and finding the man prostrate and bleeding to death, inquires, 'Who did it,' and is answered by the dying man, 'Two niggers, one a little yellow fellow.' *No one has made any suggestion.* As said by Judge BIGELOW, *this last statement may well be deemed a part of the sentences he uttered immediately after the fatal stab was inflicted. They are not mere narrative.* They are uttered in the presence of a witness who has heard his cries for the police, who has seen him stagger and fall covered with blood, and went at once to his relief, and found him bleeding to death. *It was not, then, a mere narrative unsupported by the principal fact,* but it is in direct connection with it and illustrative and explanatory of it. *No sensible man would reject such evidence in his own affairs.* We think the court committed no error in holding it competent.'' (Italics ours).

Among other cases cited by BLACK, J., and also by GANTT, J., is the case of Ins. Co. v. Mosley, 8 Wall. 397,

where the question was, whether the deceased met his death by accident. In the lower court, the wife and son testified that he had left his bed in the night, and that when he came back he said he had fallen downstairs and complained of being hurt. He died a short time thereafter. The Supreme Court of the United States, SWAYNE, J., delivering the opinion, held the declaration need not be cotemporaneous with the act and that such statement of deceased was admissible as *res gestae.*

We think the principle announced in the foregoing authorities is sound and should rule this case. There is no contention that the declaration of the deceased, which he first made without having been spoken to by either Alburty or Reber, to-wit, "I am done for for all time to come," was not a spontaneous exclamation and declaration. It is true that the subsequent declarations were made in answer to questions, but they were made immediately following the first clearly spontaneous exclamation of the deceased, to companions who were the last persons with him before his injury, and the first persons to him after his injury, while he was still lying and suffering at the place where he was injured, and within a few minutes after its occurrence and his mind may well have been obsessed with the injury and its consequences and dominated with the idea that he was "done for for all time to come." Under such circumstances, there is no or little chance for deliberation or reflection and such declarations are not deprived of the element of spontaneity or so separated from the principal fact or from the first spontaneous exclamation, as to prevent them from being continuations thereof, and make them *mere* recitals of a previous event. All of the declarations were made at the same time and place and under the same circumstances, except that some were made in answer to questions, which, under the rule in the Martin Case, supra, where the declaration admitted was also in answer to a question, we hold, does not bar them as evidence, because they were all a part and parcel of the

304 Mo.—37.

spontaneous exclamation first made by the deceased, which was a part of and connected them with the principal fact, as was held of the declaration in the Martin Case. While it is impossible to fix any particular time within which the declarations must be made, to be admissible as part of the *res gestae,* and many cases may be cited where four or five minutes, as in this case, was held too great a time, a great many cases are collected in the elaborate notes to Bernard v. Grand Rapids Paper Box Co., 42 L. R. A. (N. S.) 1. c. 953 *et seq.,* where four or five minutes or more after the accident was held not too great.

Learned counsel for appellant cite the following cases as conflicting with the conclusion we have reached: State v. Reeves, 195 S. W. (Mo.) 1027. In that case, the act sought to be introduced as part of the *res gestae* happened an hour or two after the principal fact, and was clearly the result of deliberation and reflection. To be admissible, the court said (p. 1031) that the two need not be concurrent, but so nearly so "that the one is clearly influenced by the other" and "must occur while the party is under the immediate influence of the scene and surroundings of the occurrence," which was not so in that case, but is so in the case at bar. In Redmon v. Railway, 185 Mo. 1, the opinion being written by GANTT, J., the conductor, while he and another were removing the injured passenger from the car, said the accident was caused by a coupling-pin falling from the car into the slot-rail, and the remark was elicited by a question of the injured party. There was no previous unsolicited, spontaneous declaration with which the declaration offered in evidence was immediately connected and a part, as in this case. This is also true of Ruschenberg v. Railroad, 161 Mo. 80. In these cases, the declaration, too, was made by the agent of defendant and not by the injured party. In Adams v. Railroad, 74 Mo. 553, it was held error to admit evidence that after the deceased was struck and killed by the train and after the train had

stopped, the fireman and engineer came up and one said to the other, "If you had stopped the train, when I told you, you would not have killed him," and the other answered, "It cannot be helped now. It is too late." In that case, the court seemed to rule, that the declaration must be practically contemporaneous with the principal act, and that declarations by agents of defendant were more strictly regarded than those of the injured party. A reason might exist for such distinction, as the suffering of the injured person would tend to prevent his mind from deliberation and cause it to act spontaneously, which might not be so when the declarations are made by others not injured. In State v. Hendricks, 172 Mo. 672, the wife was not permitted to state what the husband said to her after the fight in which he was killed was over, and he had left the scene and place of the assault and returned to his home. But the court, in that case, distinguished it from State v. Martin, 124 Mo. 514, which the court referred to with special approval. The case of Leahey v. Railroad, 97 Mo. 165, cited by appellant, which we have heretofore referred to, supports the conclusion we have reached. Other cases cited by both appellant and respondent are from our courts of appeal and seem to be conflicting, some of them apparently supporting the appellant's contention, and some of them respondent's contention. Indeed, the authorities generally are in such conflict that it is said by the learned author of the extensive notes to Bernard v. Grand Rapids Paper Box Co., 42 L. R. A. (N. S.) l. c. 965: "In this condition of the decisions, it is impossible to formulate a rule, or to define a condition of circumstances, or to give the time within which the statement must be made in order to be *res gestae*."

Without attempting to reconcile all of the cases, even of this court, we think that the well-considered cases of Leahey v. Railroad, 97 Mo. 165, and State v. Martin, 124 Mo. 514, announce sound principles of law governing the admissibility of declarations *of injured parties* as *res gestae*.

We rule this point for respondent.

III.   But, it is said that, admitting the statements of the deceased after his injury as *res gestae*, there is in-

Case for Jury.

sufficient testimony to go to the jury to make out plaintiff's case, even under the humanity doctrine.   We must also deny this contention.

The fact that both the fireman and the engineer did not see the deceased at all, either approaching or on the track or right of way, or knew of the accident when it happened, and that plaintiff's evidence and the circum-stances in the case, tend to show that they could have seen him had they looked with reasonable care, either on the track or right of way, for more than a half mile before they reached the crossing, and that they failed either to ring the bell or sound the whistle, as required by law, is evidence that they were negligent in not care-fully watching out for the crossing and for persons who might be thereon.   Travelers have a right to be on the public road and cross over the railroad tracks thereon, and it was the duty of the enginemen to exercise reason-able care to discover and avoid injuring them while so doing.   [Jackson v. Southwest Mo. Ry. Co., 189 S. W. (Mo.) 381; State ex rel. v. Sturgis, 281 Mo. 598, 221 S. W. 91; Central Coal & Coke Co. v. Railroad, 215 S. W. (Mo. App.) 914; Underwood v. West, 187 S. W. (Mo. App.) 84; Logan v. Railway, 300 Mo. 611.]

There is evidence that the enginemen could have seen deceased on this straight and level track and bright, clear day, in time, whether going twenty-five or forty miles an hour, and especially if going but twenty-five miles an hour, as testified to by the witness Adams, to have stopped or checked the train without injuring the deceased.

But, it is said that there is no evidence that the en-ginemen could have seen him in peril, or that he was help-less on the track or in dangerous proximity thereto, in time to have saved him.   We think there is evidence for

the jury on that point.  There is evidence by his physician that he was twice troubled with numbness of the legs a year or so before his injury.  On the day he was injured, while he said nothing about his legs, prior to his injury, he stopped on the journey with his companions, when 200 feet south of the railroad track and said, "You men go on.  I have all the walking I care about."  He was past seventy-two years of age.  It is likely he did not walk fast or firm over the right of way or the crossing before his legs gave way, which the defendant's servants in charge of the train by due care could have observed.  He said, when asked how the accident happened, that the train struck him, that while crossing the track his legs gave way and he couldn't get off in time; that he saw the train when it was over half way to Ritchie, and that he had "worlds" of time to have made it, if his legs hadn't given way.  The proper interpretation of his statement is, that he was on the track, when his legs gave way, and the train was then so far from him that he had "worlds" of time to cross the tracks and get out of danger, had his legs not given way.  His language, and all the facts and circumstances must be given the most favorable interpretation for plaintiff of which they are reasonably susceptible.  If his legs gave way while on the track, as he said they did, he must have fallen or crouched down in a recumbent position on the track, and the enginemen would have seen him falling, or thus lying or recumbent on the track, had they carefully watched out for him on the crossing, as it was their duty to do.  At least, that was a question for the jury.  It was also a question for the jury under plaintiff's evidence, and all the circumstances, whether he was thus disabled on the track or within the danger zone a sufficient length of time for the enginemen to have discovered his peril, had they exercised reasonable care in observing him, in time to have avoided injuring him by stopping or checking the train.  Plaintiff's evidence tended to show

that, by due care, the train could have been absolutely stopped within the space of 520 or 530 feet, and checked up in a shorter space, which might have prevented the train from striking him with such force as to cause his death, but which was not done or attempted to be done. Also, that the enginemen could have seen a man lying or prostrate on the track half a mile away.

We rule this point against appellant.

IV. Furthermore, let us assume that we are in error as to our conclusion that the statements of the deceased admitted in evidence were part of the *res gestae* and that they should have been excluded. In that event, plaintiff's husband being dead, the presumption is that he was not guilty of contributory negligence. [McDaniel v. Hines, 292 Mo. 201, and cases cited; Weller v. Railroad, 164 Mo. l. c. 198 *et seq.*, and cases cited.] Also, independent of deceased's declarations, the other facts and circumstances shown in evidence would show or tend to show that he was killed by the train at the public crossing. The plaintiff's evidence tends to show that the statutory crossing signals were not given. In such state of facts, under our statute (R. S. 1919, sec. 9943) requiring such signals, there is a presumption that the failure to give them is the proximate cause of the injury, and the burden of proof is upon the defendant railroad to show the contrary. If the declarations of the deceased admitted in this case are excluded, there having been no eye witness to the accident or any part of it, there would be no evidence, much less conclusive evidence, as a matter of law, that the failure to give the statutory signals was not the cause of the death of plaintiff's husband, and the demurrer to the plaintiff's evidence would still have been properly overruled. [McGee v. Railroad, 214 Mo. 543-544, and cases cited.]

The judgment is affirmed. *Lindsay, C.,* concurs.

· PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of Court in Banc. All of the judges concur, except *Graves, C. J.*, and *Woodson, J.*, who dissent.