Herschel CONLEY, a Minor, by Robert Conley, His Father and Next Friend, and Robert Conley, Respondents,

v.

William BERBERICH, Jr., Elsie S. Berberich, M. A. McEvers, Trustee for Wilbert Berberich, and Wilbert Berberich, d/b/a Berberich's Delivery, Appellants.

No. 29567.

St. Louis Court of Appeals.

Missouri.

April 2, 1957.

Motion for Rehearing or to Transfer to Supreme Court Denied May 3, 1957.

Jones, Hocker, Grand, Peper, Martin & Roudebush, and James L. Nouss, St. Louis, for appellant.

Morris B. Chapman, John Gitchoff, Granite City, Ill., Frank Bild, St. Louis, for respondent.

HUNTER, Special Judge.

Herschel Conley, a seventeen-year-old boy, brought this action by his father, Robert Conley (plaintiffs-respondents) against William Berberich, M. A. McEvers, Trustee for Wilbert Berberich, and Wilbert Berberich, doing business as Berberich's Delivery (defendants-appellants) for damages. Count I of the petition sought recovery in the sum of $25,000 for personal injuries suffered by Herschel allegedly as a result of his right hand being injured by defendants' truck pinning it against the gate of a building entrance. Count II of the petition sought $4,000 for Robert Conley for incurred medical expenses and loss of earnings of his son resulting from the accident. The case was submitted to the jury on both counts. Its verdict was for plaintiff, Herschel, in the sum of $3,500 on Count I, and for plaintiff, Robert, in the sum of $252.50 on Count II. After an unavailing motion for new trial, defendants have appealed.

According to the evidence on plaintiffs' behalf, the accident occurred at the rear entrance of the Granite City News Company in Granite City, Illinois. Defendants were engaged in the business of transporting and delivering the Post-Dispatch newspaper throughout the St. Louis Metropolitan Area, and operated trucks for that purpose. For at least several months one of these trucks driven by Ormond Greer, an employee of defendants, had been making deliveries to the Granite City News Company where Herschel Conley was employed. The practice was that on each Friday afternoon the Sunday Comic strips would be delivered to the rear entrance of the building occupied by the Granite City News Company. To get to the desired position there, defendants' truck would be turned and backed into position by using the private driveway or parking lot behind the building occupied by the News Company. The bundles of comics would then be transferred from the truck's tailgate through the rear door of the news company building. This same process of delivery also occurred sometimes on Satur-

days when the main sheets and editorial part of the paper were delivered. As a part of this process Herschel Conley would assist in positioning the truck to facilitate the transfer by directing its driver, Greer, to the desired position at the rear door. Then Herschel would remove the stacked paper bundles from the truck's tailgate and carry them into the building.

On Friday, August 27, 1954, Herschel was sitting, counting money, at a desk located some fifteen feet from the rear door and inside the building. He saw defendants' delivery truck come in the driveway. He testified that he then got out of his chair and went to the back door to start directing the truck back into the building so they could throw off the Sunday papers. He took a position near the center of the back door entrance at a point six to eight inches outside that door with his heels against the doorsill. He saw the driver and "said, 'Hi, Pop,' real loud, and he said, 'Hi, Kid'." At that time the truck was just turning around. As the truck started coming back, Herschel, still remaining in the described position motioned to him to come on back, and when he got "close enough" (three or five feet away) told him to hold. The truck was moving at a rate of approximately one mile per hour. Herschel further testified "Well, then, he didn't stop, and I tried to get out of the way and I tripped over the sill on this door and tried to catch myself with my hand on the iron gate, and the truck came back and caught my hand * * *" The iron gate of the doorway mentioned was open and back almost flush with the outside wall of the building. Herschel immediately ran without stopping through the building office, where he told a fellow employee, "Bill", that he had hurt his hand, and continued to run about one hundred and fifty feet to a fire station. It took him one-half a minute to get there. At the fire station one of the firemen, "Red", wrapped a towel around his crushed and bleeding hand, and he told "Red" how it was injured. Then he was taken to St. Elizabeth's Hospital where he

remained for four days while his hand was being operated on and treated.

With respect to the extent of his injuries, his physician stated that he saw Herschel at 11:45 that morning in the emergency room of St. Elizabeth's Hospital. Herschel's right hand had suffered "a crushing injury, to the base of the thumb with a compound comminuted fracture of the metacarpal bone which was protruding both on top and bottom and emulsion of the soft tissues and muscles into remnants." He was taken to surgery, the soft tissues repaired and the fracture reduced. He remained in the hospital through September 1, 1954. The hand was first placed in a splint until the wound healed. Then it was placed in a cast extending down to the base of the fingers and the entire thumb. This cast was worn from September 13th to October 15th, 1954. As a result of the accident there is some permanent slight angulation due to bone absorption and contracture of the muscles that were damaged. There are two permanent scars, one on the dorsum of the metacarpal area and one on the ventrose surface, and also permanent atrophy of the thenar eminence. The doctor's last examination of Herschel was on March 5, 1955, and it was the doctor's medical opinion that "there is considerable amount of weakness in grasping and extending the hand, and there is also tenderness and a scar which is usually permanent." Herschel testified he was earning $35 per week at the time of the accident. His doctor's bill was $125 and his hospital bill was $127.50. He was unable to return to work until January 1955. Meanwhile, he couldn't write very well or fast and was a little bit behind in his studies. His thumb is still sore when the weather changes and it is still a little stiff. It hasn't got its grip as it should have. However, he is able to drive a truck now.

Defendants' delivery truck had plywood back of the driver's seat against which newspapers were stacked. This arrangement shut off any view through the back of the truck. This was the situation on the

day in question when, according to the testimony of defendants' driver, Greer, he drove the truck in the usual manner into the lot and turned it around so as to be able to back up. Greer further testified that as he started to back up to the building doorway, which was then 30 or 40 feet away, he looked through his right mirror to the rear. He then looked out his left door to the back and from that position he could see the entire door. He then slowly backed the truck toward the building, and as he neared the building he could not see the entire door, but could see the left panel of it. Greer testified that he stopped the truck three feet away from the building entrance, and that he did not strike anything with the truck. He disclaimed seeing or speaking to Herschel that day. He also disclaimed any personal knowledge of the accident.

On this appeal defendants first urge that plaintiffs' Instructions 5 and 6 are erroneous in that (1) they place a greater burden on defendants than is required by law, and (2) that they contain incorrect abstract statements of law and are repetitious and confusing.

■ It is conceded by all parties that the substantive law of the State of Illinois applies to this action. Also in view of the pleadings and admissions we are required to take judicial notice of the public statutes and judicial decisions of that state. Section 490.080 RSMo 1949, V.A.M.S.; McCain v. Sieloff Packing Co., Mo.Sup., 246 S.W.2d 736.

The complained of Instructions 5 and 6 include in their first paragraph identical abstract statements of law concerning the duty of a driver to maintain a lookout to avoid causing injury in backing up a vehicle. Immediately thereafter in the following paragraph Instruction 5 submits failure to brake or stop, and Instruction 6 submits failure to keep a proper lookout. Each of these two instructions calls for a finding by the jury of such facts as would in accordance with the applicable law justify a verdict for plaintiff by the jury, and they are not im-

proper or erroneous unless made so by the incorporation in them of the abstract statement of law to which we have generally referred. Neither instruction has the virtue of brevity, and we refrain from setting them out in all their length in this opinion.

■ It is a well settled rule that instructions which contain abstract declarations of law, such as these two instructions do, are not favored, and, if given, should correctly declare the law. Schaefer v. Kansas City, Mo.App., 270 S.W.2d 84. In any event such an instruction should be accompanied by a further call for a finding by the jury of all the facts required by law to justify and permit the verdict. Cuddy v. Schenewark, Mo.Sup., 231 S.W.2d 689; Carson v. Evans, 351 Mo. 376, 173 S.W.2d 30. While instructions containing mere abstract statements of law are not looked upon with favor and should not be given, nonetheless, the giving of such an instruction is not reversible error on appeal unless it appears from the circumstances of the case that the instruction was confusing, misleading and prejudicial in the particular case. Benham v. McCoy, Mo.Sup., 213 S.W.2d 914; Davenport v. Midland Building Co., Mo.App., 245 S.W.2d 460; Carson v. Evans, supra.

■ In the instant case the complained of portion of Instructions 5 and 6 apparently were taken from an instruction approved by the Supreme Court of Wisconsin. Hartzheim v. Smith, 238 Wis. 55, 298 N.W. 196. This does not mean that it is a correct statement of the substantive law of the State of Illinois on the particular point. However, as we have examined it in the light of the cases cited by all parties to this action, and in the light of other Illinois cases, we have concluded that while it is not well stated, and certainly both need not and should not have been placed in Instructions 5 and 6, it does not appear from the circumstances of this case that it was confusing, misleading and prejudicial. Nor do we find that these two instructions place a

greater burden on defendants than is required by law.

██ Defendants also urge that inasmuch as plaintiffs' evidence indicated that the driver of the truck knew plaintiff was behind the truck assisting and directing the driver in backing and parking it, and instruction No. 6 required the jury to so find it would not be possible for a failure of the driver "to keep a lookout" to be the proximate cause of Herschel's injuries. We are not so persuaded. We think that the evidence, with all its reasonable inferences, presented an issue of fact for the jury on this question. We conclude that the giving of the complained of instructions was not reversible error. Benham v. McCoy, supra; Davenport v. Midland Building Co., supra; Carson v. Evans, supra; Kieffer v. Bragdon, Mo.App., 278 S.W.2d 10; Coats v. Old, 237 Mo.App. 353, 167 S.W.2d 652.

██ Defendants' next contention is that the evidence failed to show that plaintiff, Herschel Conley, was exercising due care for his own safety, and that defendants were negligent. The verdict directing Instructions 5 and 6 as given by the Court placed on plaintiffs the burden of proving that Herschel Conley was exercising due care for his own safety and that defendants were negligent, and on our review of the record before us by viewing the evidence in the light most favorable to plaintiffs and according to plaintiffs the benefit of all favorable inferences reasonably arising from all the evidence, as we are required to do, we think the issues of negligence and freedom from contributory negligence presented issues of fact for the jury and were properly submitted to the jury. Defendants rely heavily upon the case of Trainor v. McCann, 344 Ill.App. 262, 100 N.E.2d 494. We have examined this Illinois decision with particular care. While the case in some aspects is somewhat similar, we believe the factual differences between it and this cause are such as to make them clearly distinguishable. We doubt if it would serve any useful purpose to lengthen this opinion by detailing and comparing the evidence in each of the two different cases. The question of whether or not a plaintiff exercised due care for his own safety is one that must be decided on the facts of each particular case.

██ We next consider defendants' contention that it was error to permit plaintiffs' witness, William Hillman, to testify to the conversation he allegedly had with Herschel Conley at the fire station immediately after the accident. Plaintiffs' evidence was that when Herschel's hand was released from its pinned position between defendants' truck and the iron gate of the building he ran without stopping through the building office where he told a fellow employee, "Bill", that he had hurt his hand, and continued to run about 150 feet to a fire station (taking 30 seconds' time) where he told a fireman, "Red", how his hand was injured. Meanwhile "Red" looked at his injured and bleeding hand, put a towel around it, and called a car to take Herschel to the hospital. At the trial "Red", who was identified as William Hillman, a fire captain, testified to what Herschel told him as follows: "Well, when I looked at his hand, I looked at him and says, what in the world happened. Q. And did he answer you? A. He told me he got his hand caught between the tailgate of the truck and the back of the building". We agree with defendants that this evidence is both hearsay in nature and self-serving. The precise question is, did the trial court err in admitting it as part of the res gestae. It has long been settled that the doctrine of res gestae is an exception to the hearsay rule. This is so because of man's experience that under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled dominion of the senses, and

during the period when consideration of self interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts observed by him; and therefore may be received as testimony of those facts. VI, Wigmore on Evidence (Third Edition) Sec. 1747, Pages 135-6; Sconce v. Jones, 343 Mo. 362, 121 S.W.2d 777. The utterance need not be strictly contemporaneous with the exciting cause. Our courts have refused to fix definite limitations as to the time of utterance but have considered the element of time in relation to the surrounding circumstances. If the declarations spring from the principal fact, tend to explain it, and are made at a time so near it as to preclude the idea of deliberate design, they may be treated as sufficiently contemporaneous although not necessarily concurrent in time. Bennette v. Hader, 337 Mo. 977, 87 S.W.2d 413, 101 A.L.R. 1190; 20 Am.Jur., Evidence, Sec. 669, p. 562. They are admissible as being near enough to the event to be the result of the exciting cause, and not the result of reflection or deliberation. In this regard each case must depend on its own circumstances. Pryor v. Payne, en banc, 304 Mo. 560, 263 S.W. 982; Toon v. David G. Evans Coffee Co., Mo.App., 103 S.W.2d 533; Woods v. Southern R. Co., Mo.Sup., 73 S.W.2d 374.

 Further, trial courts are privileged to exercise a reasonable discretion in determining whether or not hearsay testimony of statements made are admissible as part of the res gestae. Moore v. St. Louis Public Service Co., Mo.Sup., 251 S.W.2d 38, 40; Wilson v. Toliver, Mo.Sup., 285 S.W.2d 575, 584; Landau v. Travelers' Insurance Co., 305 Mo. 563, 267 S.W. 376.

The instant situation falls within the reason and the scope of the res gestae rule. We have the occurrence (corporeal injury by violence) sufficient and startling enough, in our opinion, to produce this nervous excitement and to render the utterance spontaneous and unreflecting. The trial court did not err in allowing the questioned statement to be introduced in evidence.

Defendant's final assignment of error is that the verdict is excessive. They cite one case, Phegley v. Graham, 358 Mo. 551, 215 S.W.2d 499, 6 A.L.R.2d 382. That case involves entirely different injuries to a 51-year-old man who fell down an elevator shaft. In that case the jury award of $25,-000 was held to be excessive by $5,000. As an intended comparison of either injuries or amounts properly awarded it is not persuasive in the instant case.

 The general rule is that the function of assessing damages is peculiarly that of the jury, whose clear duty in a case of liability is to award such sum of money as will reasonably compensate the plaintiff for the injuries sustained. The jury's discretion is conclusive on appeal unless the verdict is so grossly excessive (or inadequate) as to indicate an arbitrary exercise and abuse of discretion. The verdict is excessive when it offends against all sense of right, indicates that it results from passion and prejudice, and shocks the judicial conscience. An appellate court should not interfere with the action of the jury unless the injustice of the size of the verdict is manifest. Sutton v. City of St. Joseph, Mo.App., 265 S.W.2d 760, 769; Arl v. St. Louis Public Service Co., Mo.App., 243 S.W.2d 797, 800; Cuddy v. Schenewark, Mo.Sup., 231 S.W.2d 689, 692; Peterson v. Kansas City Public Service Co., Mo.Sup., 259 S.W.2d 789, 794. In viewing the verdict an appellate court should take into consideration the economic conditions, current costs, and the purchasing power of the dollar at the time the verdict is rendered. In these days of inflation a higher level of maximum damages is warranted in order fairly and reasonably to compensate a plaintiff for his injuries. Brown v. Payne, Mo. Sup., 264 S.W.2d 341, 348; Rodefeld v. St. Louis Public Service Co., Mo.Sup., 275 S.W.2d 256, 262; Pitt v. Kansas City Pub-

lic Service Co., Mo.Sup., 272 S.W.2d 193, 197; Arl v. St. Louis Public Service Co., supra; Jensen v. Kansas City, 361 Mo. 967, 238 S.W.2d 305, 309.

When the evidence is considered favorably to the plaintiff and to the verdict of the jury, as the law requires when the question of excessiveness of a jury verdict is raised on appeal, we hold that this verdict, while possibly liberal, does not shock the conscience of the court and is within the bounds of reason. Cuddy v. Schenewark, Mo.Sup., supra; Dickerson v. St. Louis Public Service Co., en banc, Mo., 286 S.W.2d 820; Ketcham v. Thomas, Mo. Sup., 283 S.W.2d 642, 652; McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542. We conclude that the verdict is not legally excessive.

The judgment of the Circuit Court is, accordingly affirmed.

MATTHES, Acting P. J., and ANDERSON, J., concur.