Elizabeth KIEFFER (Plaintiff),
Respondent,

v.

Allen BRAGDON and Dudley A. Bragdon,
Jr. (Defendants), Appellants.

No. 29026.

St. Louis Court of Appeals.

Missouri.

April 19, 1955.

Luke, Cunliff & Wilson, Hugh S. Wilson, John B. Busch, Wilton D. Chapman, St. Louis, for appellants.

Robert W. Henry, St. Louis, for respondent.

HOUSER, Commissioner.

Action for damages for personal injuries sustained by Elizabeth Kieffer in a collision between a Dodge automobile driven by her and an MG automobile owned by defendant Dudley A. Bragdon, Jr., and driven by defendant Allen Bragdon. A jury verdict was returned in favor of plaintiff in the sum of $7,500. From the judgment of the Circuit Court of St. Louis County entered upon the verdict both defendants have appealed.

The petition alleged that while plaintiff was driving the Dodge west on U. S. Highway No. 40 the defendants negligently entered the highway in the MG in front of the Dodge when the MG was in dangerously close proximity, turned the wrong way into a one-way highway, failed to maintain a vigilant watch, and traveled at a high speed, as a result of which the collision and damages occurred. Other specifications of negligence, abandoned in the submission, are immaterial here. Defendants' answers consisted of separate general denials and pleas of contributory negligence.

The collision occurred in St. Louis County on the westbound portion of No. 40, a dual highway built with two contiguous lanes for westbound traffic and two contiguous lanes for eastbound traffic. The westbound and eastbound trafficways are separated by a 30-foot grass-covered parkway. The scene of the collision was that portion of the westbound trafficway immediately west of the west end of the bridge overpass at the cloverleaf intersection where No. 40 crosses over Lindbergh Road, in St. Louis County.

Plaintiff, the sole occupant of the Dodge, was driving west on No. 40. Defendants, with Allen at the wheel and Dudley seated alongside, were traveling south on Lindbergh Road intending to turn west at the intersection and proceed west on No. 40. Under prevailing traffic rules defendants, coming south on Lindbergh Road, in order to accomplish their purpose, would turn to the right before reaching the point where Lindbergh Road goes under the No. 40 overpass bridge and drive in an ascending curve to the left, which would bring them to the north lane of the westbound No. 40 trafficway, at which place there was a stop sign. After observing the stop sign

defendants would turn to the right into No. 40 and thence west. Traffic traveling west on No. 40 and intending to turn at the intersection to travel south on Lindbergh Road would drive across the overpass bridge, execute a right turn, proceed on a descending right curve to the west edge of Lindbergh Road, stop, turn right into Lindbergh Road and proceed thence south. Allen Bragdon drove the MG south on Lindbergh Road, made a right turn at the proper place and took the proper course, proceeding on an ascending curve to the left until he reached a fork in the pavement. The left fork was the one-way cutoff used for diverting from No. 40 westbound traffic intending to turn south at the intersection. The right fork was the one-way pavement used by southbound traffic coming off Lindbergh Road intent on proceeding west on No. 40. Becoming confused Allen Bragdon mistakenly took the left fork instead of the right fork, drove the MG into No. 40 without stopping and headed east instead of west thus proceeding the wrong way on a one-way, three-lane trafficway. Almost immediately after straightening out in an eastward course the MG collided head-on with the westbound Dodge.

Defendants' first point, that plaintiff was guilty of contributory negligence as a matter of law, requires a detailed review of the evidence viewed in the light most favorable to plaintiff. Approaching the overpass on No. 40 from the east there is a slight upgrade and the trafficway widens out into three lanes. It continues as a three-lane trafficway across the overpass bridge and for several hundred feet west. A westbound motorist ascending the incline cannot see the northwest quadrant of the cloverleaf until he reaches the top or center of the bridge. A four-foot concrete railing on the north side of the bridge interferes with one's view to the right or north as one travels west. The highway was dry, the weather was hot, and there was sufficient light to see clearly without the necessity of turning on headlights. As plaintiff, traveling west, entered the east end of the bridge there was another westbound car in front of her, traveling about 30 miles

per hour. This car was driven by Sam C. Nicholl. Plaintiff was operating the Dodge about 30–35 miles per hour. Both the Nicholl car and the Dodge were traveling in the right or northernmost lane as they crossed the bridge. At about the center of the bridge Nicholl signaled a right turn and started to slow down to make a right turn on the cutoff. The distance between the west end of the overpass bridge and the cutoff is 173 feet. Plaintiff then pulled over into the center lane. When Nicholl made his hand signal the MG was in the northwest quadrant of the cloverleaf, coming up to No. 40, its tires squealing as it made the turn, traveling between 40 and 45 miles per hour. Without stopping or reducing its speed or sounding a horn Allen Bragdon drove the MG into No. 40, swerving around in front of the Nicholl car, apparently increasing the speed of the MG in order to avoid a collision with, and passing some 8 or 10 feet in front of, the Nicholl car. The Nicholl car, in front of and to the right of the Dodge, began to swerve from side to side in an irregular manner. Plaintiff saw the MG when still headed south and as it was entering No. 40. At that time the Dodge was 75–100 feet east of the cutoff. Nicholl cut over to the right side of the road, his brakes practically locking in an effort to avoid colliding with the MG. The MG swerved out to miss the Nicholl car, went around the Nicholl car, which was practically stopped by that time, and collided head-on with the Dodge at a point about 30–40 feet east of the cutoff and in the middle of the three lanes. The driver of the MG apparently did not apply his brakes. When the MG swerved toward the Dodge plaintiff grabbed hold of the steering wheel, slammed on the brakes and "froze." At the time of impact the Dodge had not yet come up even with the Nicholl car, but was half a car length behind it; "halfway in back" of the Nicholl car.

Plaintiff was an experienced automobile driver. The brakes and tires on the Dodge were good. Taking into consideration road and weather conditions it would take her approximately 75 feet, including reaction

time, to stop the Dodge traveling at a speed of 35–40 miles per hour. Although Allen Bragdon had driven other automobiles extensively he had not driven an MG, a British-made car, before that date. Allen was unfamiliar with the intersection and conceded that he failed to observe the one-way sign at the fork, and that he entered No. 40 without stopping or slackening his speed and without observing any approaching traffic. He looked to the right, instead of the left, before entering the highway, and conceded that he did not sound his horn. He testified that the crash occurred almost immediately after he turned onto the highway, and that he had been drinking bourbon and water highballs "moderately" before the accident. After the collision Dudley A. Bragdon, Jr. said "We were certainly at fault."

Asserting that plaintiff had an unobstructed view of the highway and a clear opportunity to have seen defendants' automobile, defendants argue that plaintiff is guilty of contributory negligence in failing to swerve if she saw the MG, and in failing to look if she did not see it. It is said that her opportunity to see the MG was greater than that of Nicholl because she not only could have seen the MG approaching but also could have seen Nicholl's automobile swerving in his effort to avoid the MG. Defendants point out that there was a clear lane to plaintiff's right into which she could have swerved and conclude that plaintiff had no right to continue to hold her course and collide head-on with defendants' automobile but should have swerved into the right-hand lane and avoided the accident.

Plaintiff's contributory negligence is for the jury unless reasonable minds can draw only one conclusion, namely, that plaintiff was negligent. Thompson v. Byers Transp. Co., 362 Mo. 42, 239 S.W.2d 498. Viewing the whole evidence and all legitimate inferences deducible therefrom in the light most favorable to plaintiff and disregarding the evidence and inferences favorable to defendants, it cannot be said that the foregoing evidence convicts plaintiff of contributory negligence as a matter of law. Plaintiff's view of the northwest portion of the cloverleaf was completely obstructed until she reached the center of the bridge. From then until she reached the west end of the bridge her view was impaired by the railing. By the time she reached that point the jury could have found that her view of defendants' automobile was obstructed by the Nicholl car because it is uncontradicted that as plaintiff approached the cutoff the Dodge she was operating was to the left of and partially to the rear of the Nicholl car. The Dodge was in the middle lane, and the Nicholl car in the right-hand or north lane. The MG came from the north or right of the westbound cars, and crossed in front of the Nicholl car. As pointed out in plaintiff's brief "The cutoff from which defendants' car emerged is on a much lower level than the highway on which plaintiff was traveling." The difference in elevation would help account for plaintiff's failure to see the MG before it emerged into No. 40. There was evidence from which the jury could have excused plaintiff for not having seen the MG, which is a small vehicle, prior to the time it entered No. 40. Even if plaintiff could have seen the MG at all times prior to the time the driver took the wrong fork there would have been no duty on plaintiff's part, up to that time, to anticipate a collision. Plaintiff, familiar with the cloverleaf intersection, was entitled to assume that the MG would take the right fork and come to a stop before entering No. 40 at the proper juncture west of the cutoff. In no event, even in the absence of obstructions, would plaintiff be charged with failure to take preventive steps until such time as the MG mistakenly took the left fork and manifested an intent to proceed into the highway without stopping. By the time this happened there was ample evidence to support a finding that plaintiff's vision was obscured by the Nicholl car. When the MG entered the highway in full view of plaintiff, without stopping or issuing any warning, very little time remained before the impact. Plaintiff was then 75–100 feet from the cutoff, traveling 30 miles per hour, or 45 feet per second. The MG was approaching at the rate of 40–45 miles

per hour, or approximately 53 feet per second. All witnesses agreed that the collision occurred almost immediately after the MG entered the highway. Allen Bragdon testified that "as soon as I came off the approach the accident happened immediately;" that he did not observe the Dodge "until the split second before the contact." He attempted to swerve to the right, but the cars collided head-on. At their combined speeds the two vehicles would have traversed a total of more that 70 feet before the expiration of reaction time of ¾ of a second, and, as the evidence showed, were actually in collision almost immediately at a point approximately midway between the positions the two vehicles occupied at the moment the MG entered the highway. The MG suddenly appeared in the path of the plaintiff, thus confronting plaintiff with an emergency situation. There is the element of surprise. It cannot be said that the emergence of defendants from the cutoff in violation of the traffic rules was reasonably to have been anticipated. We cannot say as a matter of law that a driver was guilty of negligence in not choosing the course of conduct which in retrospect and after calm deliberation appears to have been the safest and best when a speeding vehicle, operating in the wrong direction on a one-way trafficway, suddenly appeared in her pathway. It was a question for the jury. The situation is drastically different from that disclosed in Wininger v. Bennett, Mo. App., 104 S.W.2d 413, cited by defendants, in which plaintiff testified that he saw defendants' truck at a time when it was 300 to 400 yards distant, approaching him on the wrong side of the road, and that plaintiff, knowing that defendants' truck was coming toward him on the wrong side, continued to drive at a high rate of speed without turning aside and, without doing anything to avoid a collison, drove his automobile into the side of defendants' truck. Defendants cite Shaw v. Wilcox, Mo.App., 224 S.W. 58, for the proposition that a driver must endeavor to avoid a collision with another driver even though the latter be negligent. The duty of a person in the place of this plaintiff to take precautions to avoid a collision, however, is predicated upon the existence of a condition of discoverable peril, as pointed out in the Shaw case, supra, 224 S.W. loc. cit. 59. Plaintiff must have been able, by the exercise of the proper degree of care, to have discovered that defendants would not or could not take action to avoid the collision. Had that discovery been made instantaneously upon the entrance of the MG into No. 40 there yet would have been insufficient time for plaintiff to have taken remedial steps because, as we have seen, the vehicles were together by the expiration of reaction time.

Defendants' next point is that there was no evidence to support a verdict against Dudley A. Bragdon, Jr., the owner of the car; that the evidence showed that Allen was driving solely for his own pleasure and that Allen was not driving the MG on any mission for, or as the agent of, Dudley. It is argued that the negligence was that of Allen alone, not participated in, directed by, or known to Dudley in time to have prevented it. Further, that after Allen made the wrong turn, Dudley warned him, at the first opportunity. The facts disclose, however, that Dudley and his nephew Allen had attended a social party together and were together in the car on the way home to Dudley's house at the time of the collision. Dudley permitted Allen to drive "so that he could have some fun and try out the automobile." It was Allen's first visit to St. Louis, and he was wholly unfamiliar with the streets. Dudley testified that he was directing him which way to go. Dudley was seated next to Allen in the two-seated car. Dudley further testified that "He (Allen) wanted to try it out, and having an excellent reputation of being a driver *and my being in the car,* I saw no reason why he should not; and that is how he happened to be driving." Dudley testified that he was paying attention to "where we were supposed to go." When Allen took the wrong fork in the road Dudley warned Allen, thus actually exercising his right of control by saying to him "You are going the wrong way" but the warning came too late, for the reason that

he was already close to or upon the highway by the time the words were uttered. Under these circumstances there was no error in submitting the negligence of Allen as that of Dudley. It is well settled in this state that the negligence of the driver of an automobile is imputable and attributable to the owner of the automobile where the owner is personally present in the automobile and where the owner and the driver of the automobile are engaged in a joint journey or enterprise, either of business or pleasure. Mendenhall v. Neyer, 347 Mo. 881, 149 S.W.2d 366, and five Missouri cases cited therein, 149 S.W.2d loc. cit. 374. In Roland v. Anderson, Mo.App., 282 S.W. 752, decided by this court, a nephew was driving his uncle's automobile with the uncle present in the automobile, as in the instant case. Both nephew and uncle lived in the same house and they were on their way home when the accident occurred. This court held the uncle liable for the nephew's negligence saying, 282 S.W. loc. cit. 754:

"The defendants certainly were engaged in a mutual enterprise, and were on a common mission. They both knew where they were going; the car being then used to take (the uncle) home, together with (the nephew). * * * while it is not shown that (the uncle) specifically issued orders to (the nephew) as to what streets he was to take, and in what manner the automobile was to be driven or operated, yet he, as the owner of the car, had such right to control and direct it. He was interested in the movement of the machine; at least to the extent that it served his purpose of taking him home on that occasion. * * * We think the defendant (uncle) cannot escape liability on the theory of not showing * * * agency."

Defendants' next point is that the court erred in refusing to permit defendants counsel to cross-examine plaintiff with reference to the results of X-ray pictures of plaintiff. The doctors who took the pictures did not testify but two of plaintiff's doctors who examined the X-rays testified that they were negative for bone injuries, fractures, or dislocations. After ascertaining from plaintiff that she had discussed the results of the X-rays with her doctors counsel for defendants sought to elicit from plaintiff that her physicians had told her that there were no fractures or broken bones shown by them. The court sustained an objection to this question and refused an offer of proof that the doctors who took the X-rays disclosed to plaintiff that they were negative for any bone injuries, fractures or dislocations. Error is urged, not on the theory that the hearsay testimony was competent to prove the fact that the X-rays were negative but that it was competent thus to show that plaintiff knew from time to time, as she came forward with new complaints, that her complaints were unsupported by any of the various sets of X-rays which were taken. Had the pleadings raised an issue of the presentation of a fraudulent claim such evidence might have been admissible. There was no such issue, however, and the evidence was clearly inadmissible, as hearsay. Hughes v. Prudential Ins. Co., Mo. App., 179 S.W.2d 630. Defendants were not deprived of the opportunity to argue that plaintiff knew that she had no fractures, for it was a matter of record that the doctors knew that the X-rays were negative for fractures and that she had consulted with the physicians as to what the X-rays disclosed. In order to make the argument, therefore, it was not necessary that plaintiff relate what the doctors had told her.

Defendants next complain that the court erroneously refused to permit cross-examination of a police officer who appeared at the scene after the accident occurred with reference to a written police report in which he made the statement: "No one injured." The record shows that when counsel for defendants, after asking the officer if he made the report and if the facts stated therein were true, undertook to read the contents of a copy of the report to the jury the court sustained an objection to the reading of the report to the jury. Cross-examination with reference to the

point in question, however, proceeded immediately after that ruling. In the cross-examination counsel for defendants elicited from the witness that on the highway and immediately after the accident, while it was fresh in his mind, the officer made a formal, accurate, full report of what he had found, in which he stated "No one injured;" that the officer observed Mrs. Kieffer and took her home, and that as far as injuries were concerned he "could not see anything;" that he "could not do anything but take their word for it," and that to the best of his knowledge the report was true; that no medical attention was given to anyone; that when someone is injured "you have to take them to a hospital," but that in this case no one was taken to any hospital or doctor's office. Full right of cross-examination was accorded defendants and no prejudice to defendants' rights is to be found in the action of the court.

 Defendants next claim that Instruction No. 1 was erroneous, because it was too lengthy, contained an undue comment on the evidence, was repetitious, and submitted conclusions of law. Instruction No. 1, a verdict-directing instruction covering the entire fact submission on several different assignments of negligence and negativing contributory negligence in a case involving three vehicles at a complicated cloverleaf overpass location, occupies 2 pages and 7 lines on a third page of the transcript. While lengthy and verbose it would be difficult to condense the subject-matter to any considerable degree, and we do not believe that defendants were prejudiced by the undue length of the instruction. Next, it is urged that instead of submitting a finding that a highway sign directing defendants to turn to the right was in place and that the defendant driver turned to the east when he should have turned to the west the instruction twice submitted a finding that he *disobeyed* the highway sign and reiterated the idea by finally requiring a finding "that in so operating his automobile the said defendant traveled the wrong way on the said highway." The question of repetition or elaboration of the same proposition in instructions is a matter of discretion on the part of the trial court, and is generally not held to be reversible error where approved by the trial judge. State ex rel. Kansas City v. Shain, Mo.Sup., 177 S.W.2d 511. Compare Wood v. Hulsey, Mo.App., 271 S.W.2d 218. There is nothing inflammatory about the use of the word "disobeyed," particularly where it is an admitted fact that the defendants disobeyed the sign and drove the wrong way on a one-way highway. It is unlikely that defendants were harmed by the instruction. See Lankford v. Thompson, 354 Mo. 220, 189 S.W.2d 217, and Bain v. Missouri-Kansas-Texas R. Co., Mo.App., 141 S.W.2d 577. Defendants further complain of the phrase "and entered the highway when plaintiff's automobile was in *dangerously close proximity* to said defendant's automobile." We see no error in this part of the submission in view of the fact that in other parts of the instruction there is a clear hypothesization of the pertinent facts (speed, placement, direction, etc., of the vehicles including the distance between them when defendants' automobile entered the highway from the cutoff, and a description of the locus in quo, road signs and rules) upon which the characterization objected to is predicated.

Instruction No. 2 submitted the liability of Dudley for the negligence of Allen on the basis that he permitted the latter to drive and remained in control of the movements of the automobile. The propriety of such an instruction under the facts of this case has been demonstrated above. Exception, however, is taken to the language of the instruction reciting that if the owner permits another to operate an automobile but remains in control thereof "the driver thereof is no more than the *alter ego* of the owner and the driver's acts are in effect just as much the acts of the owner as though the owner were the one actually operating the automobile." It is said that this language is to be condemned as an abstract statement of the law. We find no error in Instruction No. 2 in this connection. Immediately following the portion of the in-

struction of which complaint is made another paragraph follows in which the facts necessary to be found in order to establish liability under the rule of law mentioned are fully recited. In such case defendants cannot complain. Richards v. Gardner, Mo. App., 193 S.W.2d 354.

The damages instruction, No. 6, is challenged on the ground that it erroneously allows recovery for *future* physical pain and mental anguish, and for nervous shock. An allowance for these items was justified by the evidence that as a result of the accident plaintiff will be obliged to wear artificial dentures, which interfere with ability to chew, reduce the ability to taste food, and with which "you get an awfully sore gum;" the testimony of Dr. O'Reilly that plaintiff's back injury will "go on for some time longer" and "may" be permanent; and the testimony that immediately after the accident plaintiff was trembling so hard that she could not walk; that plaintiff looked stunned; and that she was under a great deal of tension when she first saw her doctor.

█ Finally, defendants propose that the verdict of $7,500 is grossly excessive. Plaintiff was 44 years of age at the time. In the accident plaintiff's right hand was knocked off the steering wheel and struck something, causing a lump on the right wrist. Her head was thrown forward with such force that her chin struck something, loosening her upper teeth. The skin was broken on her right ankle. Her right knee was skinned and her stocking torn. She was not thrown out of the seat or rendered unconscious. The car remained upright, still in the middle lane of the road, still headed west. After the accident plaintiff remained at the wheel of the automobile for approximately 45 minutes because she was trembling so that she could not walk. She stated that she did not believe that she was hurt, but that her wrist was stiff. She appeared to be stunned. Some time after the accident she was still gripping the steering wheel with her left hand, and a man reached in and pulled her fingers off the wheel. She informed the police officer who investigated the wreck that she did not know for sure, that it was "too soon after the accident to tell," whether she was hurt. She was taken to her home. Upon arrival she was still shaking. She took a hot bath and went to bed, but was not able to sleep much. She remained in bed the next day, although she left the house that evening to visit her husband who was a patient in a hospital. Two days after the accident plaintiff went to the office of Dr. J. P. Wade for examination and X-rays, complaining that her front upper teeth were loose, that she had headaches, that her right ankle was swollen and that her right wrist had a knot on it. Her right ankle was almost twice its normal size and the knot on her wrist was the size of an egg. The knot persisted to the day of trial. She had a headache constantly for six weeks. The X-rays were negative. Four days after the accident, her neck and back causing her pain, she returned to Dr. Wade. Under the direction of Dr. O'Reilly, brought in for consultation, plaintiff was given 11 or 12 two-hour heat treatments, from which she obtained no relief. She was examined by Dr. Gansloser, a neurologist, who was not called as a witness. The findings of the neurologist, who examined plaintiff for possible injuries to the central nervous system, spine, brain, spinal cord and nerves, were negative. Later Dr. O'Reilly froze her shoulder by spraying chemicals on it, but that did not afford plaintiff any relief. At the time of trial plaintiff still had pains about her neck, the lower back of her head, down the neck, and over the right shoulder and the upper two-thirds of her right side. She complained that she still had headaches. The pain had persisted for 16 months and had gotten worse. She was under the care of a dentist, Dr. Edward Reisse, for over a year. Previous to the accident she wore a bridge in place of her four front upper teeth. The bridge was fastened to her two eye teeth. The eye teeth were loosened in the accident. The dentist testified that he gave plaintiff penicillin treatments in an attempt to save the teeth which were damaged, without avail. Those two teeth and the two next to them had to be extracted, since they could

not be treated. This left four upper teeth remaining in the back part of her mouth which, although not damaged by the accident and in good condition, were required to be extracted in order to fit plaintiff with an upper denture. The eight teeth were extracted during August and September, 1953. At trial time plaintiff was wearing a temporary upper denture which would require permanent replacement. She can do her housework only a couple of hours at a time and then the pain becomes so bad that she has to stop work. Her right wrist aches and puffs and she cannot iron with it. Her right foot swells when she walks on it. Dr. O'Reilly, who first saw plaintiff eight months after the accident, found a limitation of rotation of the neck of 10 to 15 degrees, tenderness in the area around the shoulder blades and slight nodulation in the muscles in that area. His diagnosis was inflammation of the muscles alongside the vertebrae and in the muscles that bring the shoulder blades together. He testified that he examined her X-rays, which were negative for fractures, dislocations or bone injuries. The nodules in the muscles were probably caused by a small hemorrhage or sprain to the muscles. It was his opinion that since the back injury had lasted 16 months it would last for some time longer, and that the painful condition of the back may or may not be permanent. Dr. Wade saw plaintiff 10 times at his office and occasionally at her home. He testified that she no longer complains of her foot or wrist but that she still complains of pain along the spine and in the shoulder blades. He had her hospitalized for three days in August, 1952 for the purpose of a checkup. He did not find any limitation of her neck, back, arm or leg, although he did find tenderness in the spine with some "muscle guarding" or slight tension of the muscles in that area.

No special damages were proved. Plaintiff did not own the damaged Dodge automobile and hence made no claim for property damage. Nor did she make any claim on account of doctor, dental or hospital bills. In fact, there was no hospitalization except a 3-day stay for a checkup a month or so after the accident. Plaintiff was a housewife and therefore sustained no loss of wages or earnings. Plaintiff suffered permanent injury in the loss of her teeth, but the evidence with reference to the permanency of the back condition was indefinite. The neurological findings were negative. Numerous X-ray pictures were negative for fractures, dislocations or bone injuries. Except for the loss of teeth and the knot on her wrist all of plaintiff's present complaints are subjective.

Plaintiff relies alone on the case of Brady v. St. Louis Public Service Co., Mo.Sup., 233 S.W.2d 841. The injuries in that case, however, were more severe than those sustained by this plaintiff. Quite recently this court in Clayton v. St. Louis Public Service Co., Mo.App., 276 S.W.2d 621, sustained as not excessive a verdict for $6,250 in a case involving similar injuries, but in which there was positive evidence that the back and ankle injuries were permanent, which is lacking in the instant case. We have reviewed numerous cases involving similar injuries. We have applied the rules laid down in Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782. All things considered it is evident that the judgment herein is excessive in the sum of at least $1,500.

It is therefore the recommendation of the Commissioner that if plaintiff will, within 30 days, remit the sum of $1,500 from the verdict of the jury in her favor, the judgment be reversed and the cause remanded with directions to the trial court to enter judgment in the reduced amount, to wit, $6,000; and that otherwise the judgment be reversed and the cause remanded for a new trial.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court, and pursuant to his recommendation, if plaintiff will, within 30 days, remit the sum of $1,500 from the verdict of the jury in her favor the judgment will be reversed and the

cause remanded with directions to the trial court to enter judgment in the reduced amount, to wit, $6,000; otherwise the judgment will be reversed and the cause remanded for a new trial

RUDDY, Acting P. J., and WEINSTEIN, Special Judge, concur.